Clyde **HARGRAVES,** et al., Plaintiffs,

v.

**CAPITAL CITY MORTGAGE CORP.,**
et al., Defendants.

No. CIV. A. 98–1021 (JHG).

United States District Court,
District of Columbia.

Sept. 29, 2000.

Richard Ritter, Lars T. Waldorf, Washington Lawyers' Committee for Civil Rights, Jeffrey David Robinson, Duane Kenneth Thompson, Elizabeth Torrant

Sheldon, Baach, Robinson & Lewis, John Peter Relman, Relman & Associates, Washington, DC, Kurt Hirsch, Jellyvision, Chicago, IL, for Clyde Hargraves, Erlinda Cooper, Greater Little Ark Baptist Church, Nancy Hilliard, Angela Birth, Fair Housing Council of Greater Washington.

Richard Ritter, Lars T. Waldorf, Washington Lawyers' Committee for Civil Rights, Jeffrey David Robinson, Duane Kenneth Thompson, Elizabeth Torrant Sheldon, Baach, Robinson & Lewis, Kurt Hirsch, Jellyvision, Chicago, IL, for Walter Jamison, Sr.

Christopher Schwartz, Holland & Knight, L.L.P., Rena Karen Schild, Philip Michael Musolino, Musolino & Dessel, Eric Jerome Sanne, Leticia Maria Watson, Washington, DC, Capital City Mortgage Corporation, for Capital City Mortgage Corporation and Thomas K. Nash.

Richard Ritter, Lars T. Waldorf, Washington Lawyers' Committee for Civil Rights, Jeffrey David Robinson, Duane Kenneth Thompson, Elizabeth Torrant Sheldon, Baach, Robinson & Lewis, John Peter Relman, Relman & Associates, Washington, DC, for Sylvia Robinson.

Bradley H. Blower, Federal Trade Commission, Washington, DC, for Federal Trade Commission.

Michelle Aronowitz, Department of Justice, Washington, DC, for United States of America.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Defendants Capital City Mortgage Corporation ("Capital City") and Thomas K. Nash ("Nash") have moved for judgment on the pleadings, or, in the alternative, for summary judgment, on ten of the eleven counts brought in the first amended complaint. In response, plaintiffs have filed an opposition, and pursuant to this Court's March 14, 2000 Order, the United States has filed a brief as amicus curiae, addressing defendants' motion. In addition, defendants have filed motions to sever the claims and hold separate trials, to transfer this case to the United States District Court for the District of Maryland, and to preclude one of the plaintiffs from offering evidence of emotional distress. The motion for summary judgment is denied in part and granted in part, and the other three motions are denied.

### I. Factual background

The plaintiffs allege that the defendants have engaged in a pattern or practice of predatory and racially discriminatory lending in the Washington, D.C. metropolitan area. Capital City is a Maryland corporation with its principal place of business in the District of Columbia, which makes and services loans. Nash is Capital City's president, and, through Mortgage Banking Trust, wholly owns Capital City. Specifically, plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), (d), & § 1964(c) (2000), the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a) & (b), 3605(a)-(b)(1) & (b)(2) (1994), the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(a) (1998), civil rights violations under 42 U.S.C. § 1981 & § 1982 (1994), unfair and deceptive lender practices, D.C.Code § 28–3312 (1996), fraud, and breach of contract.[1]

The plaintiffs' claims are based on allegations of ongoing illegal and discriminatory activity, particularly with regard to

---

1. The FHA, section 1981, and section 1982 counts are brought by all of the plaintiffs; each of the other counts is brought by one or more plaintiffs.

four loans made by the defendants to the plaintiffs. Defendants' loan to the Greater Little Ark Baptist Church ("Greater Little Ark"), which was secured by the building where the church held services, was executed on June 9, 1990. Greater Little Ark was evicted in March, 1995. In addition to Greater Little Ark, the church's pastor Clyde Hargraves ("Hargraves"), and the financial secretary and member of its board of trustees, Erlinda Cooper ("Cooper"), are plaintiffs in this action (collectively referred to as "the Greater Little Ark plaintiffs"). In 1995, plaintiffs Nancy Hilliard and her daughter Angela Birth ("Birth") received a loan from the defendants to purchase a church, and pledged their home as collateral for the loan. Hilliard and Birth both entered bankruptcy, and are behind on their loan payments.[2] Walter Jamison ("Jamison") received a loan which was executed on or about April 17, 1991, secured by the building which housed his convenience store and two residential units. Sylvia Robinson ("Robinson") purchased residential property from the defendants. Settlement was on March 20, 1996. The eighth and final plaintiff is the Fair Housing Counsel of Greater Washington, Inc. ("FHC"). FHC alleges that the defendants' practices have caused FHC to devote its scarce resources to the investigation of defendants' lending and foreclosure activities, as well as to outreach, education, and enforcement efforts regarding the defendants' activities. Collectively, the plaintiffs allege that the defendants have engaged in "reverse redlining," targeting African-American communities with predatory lending practices. Individually, each plaintiff alleges injury from those practices.

## II. Judgment on the Pleadings, or Motion for Summary Judgment

In support of their motion for summary judgment defendants have submitted a Statement of Material Facts As To Which There Is No Genuine Issue ("Defendants' Statement"), and plaintiffs have filed a Statement of Material Facts and Facts In Dispute ("Plaintiffs' Statement").[3] Because the defendants have relied on matters outside the pleadings, the motion shall be treated as a motion for summary judgement. *See* Fed. Rule Civ. P. 12(c). As such, defendants have the burden to establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact," and that they are entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). Defendants will only be entitled to summary judgment "If the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact." *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1288 (D.C.Cir.1998).

## A. Statute of Limitations

■ The defendants argue that, under the applicable statutes of limitations, all of the FHA and ECOA claims are barred,

---

**2.** Foreclosure has been stayed by this Court's July 5, 2000 Order, but plaintiffs have reportedly not made payments as the Order required. That failure is the subject of another motion which is currently pending, but will not be addressed in this Opinion.

**3.** Instead of specifically admitting or contesting the facts as to which defendants allege there is no genuine dispute, plaintiffs' statement simply alleges their own version of the contested and uncontested facts. *See* LcvR 7.1(h). Although this format has made it more difficult for the Court to determine whether facts are disputed, she has been able to do so.

the section 1981 and section 1982 claims are barred as to all plaintiffs except Robinson, and Jamison and the Greater Little Ark plaintiffs' RICO claims are barred.

### i. The RICO claims

■ The statute of limitations applicable to RICO claims is four years. *See Agency Holding Corp. v. Malley–Duff & Assoc. Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The original complaint was filed on April 24, 1998, therefore Jamison and the Greater Little Ark plaintiffs' claims will be barred if they accrued prior to April 24, 1994. Defendants argue that a RICO claim accrues at "the earliest time at which plaintiff could have maintained an action on the merits," and cite *Riddell v. Riddell Washington Corp.,* 866 F.2d 1480 (D.C.Cir.1989), as support for that premise. Plaintiffs contend that the "discovery rule" applies, and thus their claim accrues when they knew, or should have known, of their injury.

■ The question of when a RICO claim accrues has not been definitively settled. The "last predicate act" rule was rejected in *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), and the "injury and pattern discovery rule" was rejected in *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000). However, the latter case left open the question of whether a discovery rule, or a straight injury occurrence rule, applies to RICO claims. The District of Columbia Circuit similarly declined to resolve that question in *Riddell,* 866 F.2d at 1489–90. However, a number of circuits have applied a "discovery rule" to RICO claims, including the Fifth Circuit in the *Rotella* case, and the Court will assume for the purposes of this opinion that the discovery rule applies. *See, e.g., Grimmett v. Brown,* 75 F.3d 506 (9th Cir.1996), *cert. dismissed as improvidently granted,* 519

U.S. 233, 117 S.Ct. 759, 136 L.Ed.2d 674 (1997); *McCool v. Strata Oil Co.,* 972 F.2d 1452 (7th Cir.1992); *Rodriguez v. Banco Central Corp.,* 917 F.2d 664 (1st Cir.1990); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988); *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211 (4th Cir.1987).

■ Plaintiffs contend that the defendants fraudulently concealed material facts related to the wrongdoing. If plaintiffs can make a showing of fraudulent concealment, the cause of action will be deemed "not to have accrued during the period of concealment—unless the defendant shows that the plaintiff would have discovered the fraud with the exercise of due diligence." *Sprint Communications Co., L.P. v. Federal Communications Comm'n,* 76 F.3d 1221, 1226 (D.C.Cir.1996). Whereas the plaintiffs' being on "inquiry notice" is enough to satisfy the discovery rule in normal cases, "something closer to actual notice" is required to set the statute of limitations in motion in a case involving fraudulent concealment. *Id.*

The Amended Complaint ("complaint") does contain an allegation that the defendants "concealed the pattern of racketeering," and the plaintiffs attached supporting declarations to their opposition to defendants' summary judgment motion. Hargraves and Cooper declared that by April 28, 1994, they remained unaware of the defendants' racketeering activities, and unaware that their injuries arose out of such activities. Jamison declared that he did not know that the defendants discriminated on the basis of race until May 1996, when a series of articles about the defendants was published in the Washington Post. Plaintiffs also cite to deposition testimony that the Greater Little Ark borrowers were unaware that their loan was interest only, and that the defendants failed to provide them with coupon books or any

other breakdown of monthly charges. Rather than specifically stating acts of fraudulent concealment on the part of the defendants, these allegations go to the plaintiffs' knowledge or state of mind. A bare allegation of fraudulent concealment is not sufficient, and the evidence referenced by the plaintiffs does not suggest any particular efforts by the defendants to hide their alleged wrongdoing.

 Even if plaintiffs were able to point to facts in dispute regarding the allegations of fraudulent concealment, *Rotella* makes clear that knowledge of the injury, rather than knowledge of the pattern of RICO activity, starts the clock running for statute of limitations purposes. For the most part, the supporting documentation cited by the plaintiffs does not suggest the plaintiffs were unaware of their injuries, but merely that they were unaware of the defendants' discrimination and racketeering. Awareness of the pattern of RICO activity is not necessary to start the statute of limitations period running. *See Rotella,* 120 S.Ct. at 1083. Jamison's loan settled in April 1991, and the Greater Little Ark loan settled in June 1990. Thus, long before April 24, 1994, both Jamison and the Greater Little Ark plaintiffs had repeatedly been billed, made payments, and been exposed to at least some of the consequences of the allegedly illegal and discriminatory loans. The plaintiffs have not proffered evidence genuinely disputing the fact that these plaintiffs were aware of

their injuries before April 24, 1994. The defendants' motion for summary judgment with regards to Jamison and the Greater Little Ark plaintiffs' RICO claims is granted.[4]

ii. The Remaining Causes of Action

 Under the FHA a civil action must be filed "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). Under the ECOA, suit must be brought within two years of "the date of the occurrence of the violation." 15 U.S.C. § 1691e(f). The parties agree that for sections 1981 and 1982, the Court must borrow the local statute of limitations for general personal injury actions which is, in the District of Columbia, three years. D.C.Code § 12–301(8) (1995). Defendants argue that the statute of limitations begins to run on the date of settlement. All of the loans were made before April 1996, and only Robinson's loan was made after April 1995. Defendants propose that this bars all claims under these statutes of limitations, except Robinson's section 1981 and 1982 claims.[5]

Plaintiffs propose that the Court apply a "continuing violation" theory. The leading example of that theory is *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In the context of allegations under the FHA, the Supreme Court held that continuing viola-

---

4. All of the plaintiffs argue that the discovery rule saves their other claims from the various applicable statutes of limitations, as well. For similar reasons, the other plaintiffs have also failed to show that their discovery of at least some of their injuries was delayed much past the consummation of their loans, or the first few payments they were required to make. However, because the plaintiffs have presented an alternate, successful theory which enables them to avoid the defendants' motion for summary judgment on statute of

limitations grounds, *see infra* section II(A)(ii), the plaintiffs' discovery rule arguments will not be addressed in detail.

5. The settlement dates of the loans are as follows:

| | |
|---|---|
| Greater Little Ark | June 9, 1990 |
| Jamison | April 17, 1991 |
| | (approximately) |
| Hilliard and Birth | February 27, 1995 |
| Robinson | March 20, 1996 |

tions "should be treated differently than one discrete act of discrimination," so that the complaint is timely where the "last asserted occurrence" of the pattern of violation falls within the statute of limitations. *Id.* at 380–81, 102 S.Ct. 1114.

■ The continuing violation theory has been applied in the civil rights and discrimination contexts to a number of federal statutes. *See Havens,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214(FHA); *Thompson v. Sawyer,* 678 F.2d 257 (D.C.Cir.1982) (Equal Pay Act); *Hull v. Cuyahoga Valley Joint Vocational School Dist. Bd. of Ed.,* 926 F.2d 505 (6th Cir.1991) (section 1983); *Village of Bellwood v. Dwivedi,* 895 F.2d 1521 (7th Cir.1990) (section 1982 and Title VIII housing discrimination); *Carter v. District of Columbia,* 14 F.Supp.2d 97 (D.D.C.1998) (section 1981 and Title VII); *see also Lewis v. Glickman,* 104 F.Supp.2d 1311 (D.Kan.2000) (considering continuing violation theory in context of ECOA claim, but finding that no discriminatory practice occurred within the necessary time frame). The theory applies where defendants commit "repeated, but distinct, discriminatory acts, some inside and some outside the limitations period." *See Guerra v. Cuomo,* 176 F.3d 547, 551 (D.C.Cir.1999). The continuing violations theory should be applied where the type of violation is "one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Taylor v. FDIC,* 132 F.3d 753, 765 (D.C.Cir.1997) (quoting *Dasgupta v. University of Wisconsin Bd. of Regents,* 121 F.3d 1138, 1139 (7th Cir.1997)).

The defendants argue that the continuing violation theory does not apply here because "there are no common connections between the plaintiffs and there was no continuing effect of the denial of loans from one plaintiff to another." Motion for Summary Judgment at 18. The complaint alleges a systemic practice of discrimination by the defendants. In the exhibits attached to their Statement of Material Facts and Facts in Dispute ("Plaintiffs' Statement"), the plaintiffs provide materials illustrating the racial makeup of the areas in which the defendants' loans are concentrated, and the racially divided "dual housing market" that has existed in the District, as well as the "predatory" nature of the defendants' lending practices. They allege that many of the defendants' lending practices, including exorbitantly high interest rates, the failure to engage in realistic assessments regarding whether the borrower is likely to be financially able to repay the loan, "churning" loans through multiple foreclosures on the same property, higher than average rates of foreclosure, and fraudulent fees and penalties on the loans they service, constitute "predatory" lending. The plaintiffs provide examples of those behaviors in the context of their own loans. These allegations are sufficient to demonstrate a pattern of repeated violations.

■ Defendants raise another argument that, except for Robinson's section 1981 and 1983 claims, none of the alleged discriminatory acts fall within the limitations periods. The defendants argue that the "continuing effects of past discriminatory acts" are not separate, illegal, acts, and do not enable plaintiffs to avoid statute of limitations problems. *See Guerra,* 176 F.3d at 551. Defendants contend that all actions subsequent to settlement of the loans were merely "continuing effects." While the defendants are correct that the lingering effects of past discrimination would be insufficient under the continuing violation doctrine, the plaintiffs argue that the defendants committed violations subsequent to the issuance of the loans. First,

they submit that the loans themselves were discriminatory, and actions to enforce the terms of those loans are violations in themselves. If the loan agreements were legal, and only the manner in which the defendants targeted the plaintiffs was discriminatory, the defendants' argument would be successful. *See, e.g., Dasgupta,* 121 F.3d at 1140 (policy of proportioning raises to existing salary was not in itself discriminatory, even if initial rate of pay decision may have been, therefore ongoing disparity of pay constituted effects of past violations, rather than new violations); *Dixon v. Anderson,* 928 F.2d 212 (6th Cir. 1991) (despite discrimination in initial denial of membership in a retirement system, ongoing failure to distribute benefits to plaintiffs was not discriminatory because, once the decision to exclude had been made, the retirement system operated neutrally). Here, plaintiffs allege that not only the decision to extend the loans, but the loans themselves, were predatory and illegal. As example, it is contested whether the allegedly exorbitant interest rates were discriminatory in themselves, resulting in a violation each time the defendants actively enforced them through collection letters or foreclosure proceedings. *See Contract Buyers League v. F & F Investment,* 300 F.Supp. 210, 221 (N.D.Ill.1969) (as long as illegal contracts were in operation, the violation was ongoing), *aff'd by Baker v. F & F Inv.,* 420 F.2d 1191 (7th Cir.1970); *see also Eichman v. Fotomat Corp.,* 880 F.2d 149, 160 (9th Cir.1989) (active enforcement of an illegal contract could re-start statute of limitations); *Casa Marie, Inc. v. Superior Court of Puerto Rico · for the District of Arecibo,* 752 F.Supp. 1152, 1161 (D.Puerto Rico 1990) (each time defendants went to court in an attempt to remove plaintiffs through en-

forcement of a restrictive covenant, as well as construction code violations, defendants violated plaintiffs' rights), *vacated on other grounds,* 988 F.2d 252 (1st Cir.1993). The character of the defendants' activities will need to be examined at trial, before a determination can be made as to whether those activities were independently discriminatory.

Plaintiffs also submit that in addition to enforcing the stated loan terms, the defendants committed specific violations within the statute of limitations period beginning April 24, 1996. For example, they allege that throughout the term of the loan, and specifically in March and April 1997, the defendants charged Jamison fees that were not authorized under the terms of his note, *see* Plaintiffs' Statement ¶ 21 & Plaintiffs' Ex. 34, that through May 1996 and beyond defendants charged Hilliard, Birth, and Jamison interest on unpaid interest amounts although such interest was not provided for in their notes, *see* Opposition at 53 & Plaintiffs' Ex. 57–58, and that, after March 1996, defendants charged Robinson interest on amounts of money that had yet to be advanced, *see* Plaintiffs' Statement ¶ 51, Robinson Depo. at 135. The plaintiffs have established there are genuinely disputed facts regarding whether or not violations occurred during the statute of limitations period. Under the continuing violations theory their claims are permitted.

**B. Reverse Redlining and Predatory Lending**

■ Defendants argue that reverse redlining does not constitute a violation of the FHA or sections 1981 or 1982, that "predatory" loans are not actionable,[6] that they did not target their loans toward

6. Defendants argue the term "predatory lending is of little value as a legal term," and that it is an amorphous concept which is "vacu-

ous, with its description the subject of a semantic shell game."

African–American neighborhoods and that plaintiffs' evidence does not demonstrate a discriminatory impact.

 Redlining is "the practice of denying the extension of credit to specific geographic areas due to the income, race, or ethnicity of its residents." *United Companies Lending Corp. v. Sargeant,* 20 F.Supp.2d 192, 203 n. 5 (D.Mass.1998); *see also Crawford v. Signet Bank,* 179 F.3d 926, 928 n. 4 (D.C.Cir.1999) ("redlining is the practice of financial institutions intentionally not lending to certain neighborhoods or parts of a community") (quoting H.R.Rep. No. 104–193 at 177 (1995)), *cert. denied* 528 U.S. 1145, 120 S.Ct. 1002, 145 L.Ed.2d 945 (2000). Redlining violates the FHA. *See Nationwide Mut. Ins. v. Cisneros,* 52 F.3d 1351 (6th Cir.1995); *NAACP v. American Family Mut. Ins.,* 978 F.2d 287 (7th Cir.1992). "Reverse redlining is the practice of extending credit on unfair terms to those same communities." *Sargeant,* 20 F.Supp.2d at 203 n. 5. Reverse redlining has been held to violate civil rights laws, including the FHA and section 1982. *See Honorable v. Easy Life Real Estate System,* 100 F.Supp.2d 885, 892 (N.D.Ill.2000) (reverse redlining violates the FHA); *Clark v. Universal Builders, Inc.,* 501 F.2d 324, 328, 335–336 (7th Cir. 1973) (exploitation of racially discriminatory housing market); *Contract Buyers League,* 300 F.Supp. at 216 (same).

 In order to show a claim based on reverse redlining, the plaintiffs must show that the defendants' lending practices and loan terms were "unfair" and "predatory," and that the defendants either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race. *See, e.g., Jackson v. Okaloosa County,* 21 F.3d 1531, 1543 (11th Cir.1994) (FHA violation can be demonstrated by a showing of either direct discrimination or discriminatory effects).

### i. Unfair and Predatory Actions

 Defendants argue that plaintiffs have not shown the terms and conditions of their loans to be discriminatory because they have not shown that defendants make loans on preferable terms to non-African-Americans. Plaintiffs have sufficiently alleged that the terms of defendants loans are unfair and predatory; it is not necessary that the defendants make loans on more favorable terms to anyone other than the targeted class. *See Contract Buyers League,* 300 F.Supp. at 216 (rejecting a similar argument because it would mean injustice would be allowed "so long as it is visited exclusively on negroes"). Defendants argue that they cannot be liable under section 3604(a) of the FHA because they made loans to the plaintiffs, rather than denying loans. The FHA bans discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," and makes it a violation to "refuse to sell ... or otherwise make unavailable or deny, a dwelling to any person because of race, color ..." 42 U.S.C. § 3604(a) & (b). The predatory practices alleged can make housing unavailable by putting borrowers at risk of losing the property which secures their loans.

 Congress has recognized the problem of predatory lending, and enacted an amendment to the Truth in Lending Act, the "Home Ownership and Equity Protection Act," to provide borrowers some protection from predatory loans. 15 U.S.C. § 1639 (1998). Plaintiffs have alleged several "predatory" lending practices, including exorbitant interest rates, lending based on the value of the asset securing the loan rather than a borrower's ability to repay ("equity-stripping," in other words issuing a loan "designed to fail"

and profiting by acquiring the property through default, rather than by receiving loan payments), repeated foreclosures, and loan servicing procedures in which excessive fees are charged. Defendants argue that permitting a cause of action based on predatory lending will discourage lenders from making loans to minorities. The Court disagrees. Non-predatory lenders will be able to show that their lending practices are legitimate, and so avoid liability. Whether the practices alleged occurred, and whether they were unfair and predatory, is a question for the jury.[7]

### ii. Targeting and Disparate Impact

 Plaintiffs have alleged both that the defendants have targeted African–Americans, and that their allegedly predatory lending has had a disparate impact on African–Americans. They start out by providing documentation regarding the District's historically segregated housing market.[8] To show the disparate impact, they provide statistical evidence that,

in the District of Columbia, Capital City made a greater percentage of its loans in majority black census tracts than other subprime lenders, and made an even more disproportionately large number of loans in neighborhoods that are over 90 percent black.[9] This proffer is sufficient to establish a prima facie showing of disparate impact. *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). Although evidence of intent is not necessary to show discriminatory impact, it can support such a finding. As evidence of intent, or targeting, plaintiffs point to the defendants' solicitation of brokers who operate predominately in the black community, their distribution of flyers and advertisements in black communities, the decision to place their offices in black communities, and the fact that a picture of Nash standing next to former Mayor Marion Barry, Reverend Jesse Jackson, and former District of Columbia Councilmember Arrington Dixon hung just inside Capital City's office entrance (plaintiffs allege that this

---

7. Defendants do not specifically attack plaintiffs' section 1981 and 1982 claims beyond including them in their assertion that reverse redlining and predatory lending do not constitute violations of law (and, of course, their statute of limitations arguments). Section 1981 provides for equal rights to make and enforce contracts, and section 1982 provides that all citizens have the same right to "purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. §§ 1981 & 1982. Although defendants do not highlight the difference between these statutes and the FHA, allegations of reverse redlining may be more suited to a claim under FHA, because that statute is typically given broad construction, and deals specifically with discriminatory effects on the availability of housing. *See Honorable*, 100 F.Supp.2d at 892 (comparing FHA and section 1981 and 1982 claims); *see also Havens*, 102 S.Ct. 1114, 455 U.S. at 380 (FHA embodies the "broad remedial intent" of Congress); *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1234 (D.C.Cir. 1997) ("language of the Act is broad and

inclusive and must be given a generous construction").

8. In their reply, defendants assert that paragraphs 59–61 and 66–67 of the plaintiffs' statement cannot be considered. Those paragraphs reference books, articles, government reports, and factual allegations in other cases, in support of plaintiffs' assertions regarding racial segregation and housing and mortgage practices in the District of Columbia. The evidence cited in other paragraphs of the plaintiffs' statement being sufficient, the Court has found it unnecessary to rely upon the challenged paragraphs in making her determination.

9. The defendants argue that the data plaintiffs submit is insufficient because it includes an analysis of only some of the areas in which Capital City made loans. While an analysis based on the entire loan area would have been appropriate, the study plaintiffs submit is sufficient to survive defendants' motion for summary judgment.

was an attempt to convey a message to African–Americans that Nash could be trusted). This evidence, in combination, amply establishes a genuine dispute of fact as to whether the defendants acted on the basis of race.

C. Applicability of the FHA to the Loans Involved

██ Defendants allege that a home equity loan cannot violate section 3604(b) of the FHA, and that the FHA does not apply unless the borrower intends to live in the property at issue himself.

██ Robinson took out a purchase money loan on a home. Hilliard and Birth's was a purchase money loan as well, for church property that included a residential unit; they did not live in that residential unit, but the loan was secured in part by their home. Jamison took out a home equity loan on a building containing both his store and two residential units, intending to use part of the loan to finance repairs on the residential units.[10] Section 3604 applies only to "dwellings," defined in section 3602(b) to mean "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence" 42 U.S.C. § 3602(b). Section 3605 applies to "residential real estate-related transactions," including loans "for purchasing, constructing, improving, repairing, or maintaining a dwelling" and loans "secured by residential real estate." Each of the loans was secured by property which meets the definition of a "dwelling," because the Hilliard and Birth and the Jamison loans included residential units, and Robinson's property was exclu-

sively residential. Defendants argue that because neither Hilliard nor Birth nor Jamison intended to live in the property themselves, the FHA does not apply to them. Defendants cite *Smart Unique v. Mortgage Correspondents,* (N.D.Ill.6–13–94) (Fair Housing–Fair Lending ¶ 15,937), for the proposition that plaintiffs must intend to live in the properties at issue. However, courts have allowed FHA suits brought by testers, fair housing organizations, and others who do not intend to live in the properties. *See, e.g., Havens,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (fair housing organization and testers). Furthermore, on its face, the Act does not require plaintiffs to reside in the dwellings or residential real estate.

Defendants also argue that Jamison cannot make a claim pursuant to section 3604 because that subchapter relates to the *sale or rental* of a dwelling, not to home equity loans. Plaintiffs argue that the properties at issue are "dwellings" and "residences," and that section 3605 applies to loans "secured by residential real estate." The government, in its amicus brief, argued that section 3604, as well as section 3605, applies to home equity loans, and it appears to be a close issue. However, in their opposition plaintiffs do not contend that section 3604 applies to home equity loans. The plaintiffs have apparently abandoned their allegations under section 3604 as to Jamison's loan, and the Court grants defendants' motion in this respect.

D. ECOA Claims[11]

██ Defendants allege that because they have made loans to African Ameri-

---

10. The Greater Little Ark plaintiffs are not pressing claims under the FHA.

11. Defendants argue that Hargraves and Cooper cannot state a claim as individuals under the ECOA, section 1981, or section 1982. Defendants contend that because these plaintiffs

did not apply for the loan or sign the promissory note as individuals, they cannot state a claim. Plaintiffs respond that Hargraves and Cooper were responsible for obtaining and negotiating the loan, and signed the note on the church's behalf, thus the discrimination

cans, they cannot be held to have discriminated within the meaning of the ECOA. The ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—(1) on the basis of race." 15 U.S.C. § 1691(a). By the plain language of the provision, protection is not limited to those applicants who were rejected. To the contrary, the language "with respect to *any aspect* of a credit transaction" suggests that more than one aspect of the transaction, i.e. the extension of credit, is subject to the provision. The implementing regulations provide that a "credit transaction" includes not only the extension of credit but investigation procedures, terms of credit, collection procedures, and other matters. *See* 12 C.F.R. § 202.2(m). The plaintiffs' allegations of discriminatory predatory lending, as described earlier, are sufficient to allege a violation of this section.

### E. RICO [12]

 The plaintiffs base their claims upon provisions which make it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt," 18 U.S.C. § 1962(c), and unlawful to conspire to violate that provision,

18 U.S.C. § 1962(d). The plaintiffs bring their claims under the provision which enables "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter" to bring suit in district court. To properly plead a claim under section 1962(c) or (d), each plaintiff must allege:

> (1) an injury to his business or property by reason of the violation; (2) the existence of an enterprise; (3) that the defendant was employed by or associated with the enterprise; (4) that the defendant participated in the conduct of the enterprise's affairs; and (5) that the participation was through a pattern of racketeering activity.

*Danielsen v. Burnside–Ott Aviation Training Center, Inc.*, 941 F.2d 1220, 1231 (D.C.Cir.1991); *see also BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil,* 56 F.Supp.2d 14, 49–50 (D.D.C.1999) (quoting *Klehr,* 521 U.S. at 183, 117 S.Ct. 1984) *aff'd in relevant part,* 214 F.3d 168 (D.C.Cir.2000); 18 U.S.C. § 1964(c). Defendants argue that plaintiffs have failed to allege the existence of an enterprise and that the facts do not establish the existence of an enterprise; second, they argue that plaintiffs have not established that the alleged racketeering activity constituted a pattern;[13] and finally, they assert that punitive damages, and damages for physical and emotional injuries, are not available under RICO.[14]

---

was directed towards them. Neither party cites to any case supporting their respective position. The two plaintiffs represented the church, and conducted the transaction at issue on its behalf. As such they have standing to bring these claims.

**12.** All plaintiffs, with the exception of FHC, joined in alleging the RICO counts. However, as discussed earlier in this Opinion, the RICO claims brought by Jamison and by the Greater Little Ark plaintiffs are barred by the statute of limitations.

**13.** Both "racketeering activity" and "pattern" are terms of art, *see Klehr, 117 S.Ct. 1984,* 521 U.S. at 183, but defendants challenge only the existence of a "pattern" in this case. *See* Defendants' Motion for Summary Judgment at 39 ("assuming *arguendo* the sufficiency of mail fraud claims").

**14.** Defendants also argue that the Greater Little Ark plaintiffs have not established injury and causation because they failed to allege detrimental reliance, and that Cooper and Hargraves' only damages are mental and

### i. Enterprise

■ Two counts of the complaint involve RICO. The two counts are premised on two different and contrasting allegations regarding what persons constituted an "enterprise" as defined in section 1961(4). *See* 18 U.S.C. § 1964. The plaintiffs are permitted to bring these two counts, despite the fact that the factual allegations underpinning them may conflict. *See* Fed.R.Civ.P. 8(e) (a party may state alternate claims "regardless of consistency"); *see also Independent Enters. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175 (3rd Cir.1997).

### a. Association in Fact

■ The first count is brought against both Capital City and Nash, and is premised on an "association in fact" enterprise consisting of Nash, Capital City, and others, including Leonard Walker and other unnamed "'runners' who identified and targeted potential borrowers and induced them to sign predatory loan documents with Capital City." Complaint, Count I. An "association in fact" enterprise may be "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "association in fact" enterprise is established through proof of "(1) a common purpose among the participants, (2) organization, and (3) continuity." *United States v. Richardson*, 167 F.3d 621, 625 (D.C.Cir.1999) (describing the test established by *United States v. Perholtz*, 842 F.2d 343, 362 (D.C.Cir.1988)), *cert. denied*, 528 U.S. 896, 120 S.Ct. 225, 145 L.Ed.2d 189 (1999).

Defendants argue that plaintiffs cannot establish that there was an organization through their "association in fact" theory because there was no core of constant personnel and there was no hierarchy. Defendants support their argument that there was no core of constant personnel with Nash's deposition testimony that Capital City had only two "dealings" with Mr. Walker. However, plaintiffs submit evidence that Mr. Walker was listed as broker on at least nineteen of the defendants loans, over a five year period lasting from 1987 until 1991. Plaintiffs allege that Mr. Walker "delivered" those loans to the defendants, and received significant fees in exchange. That allegation is sufficient to show that the organization had at least one other "core personnel" member for that period of time.

As to the possibility that other brokers were part of the core of constant personnel, defendants argue that no other brokers consistently worked with the defendants. Nash testified in his deposition that "[g]enerally, we hear periodically infrequently from a lot of brokers." In contrast, the complaint indicates that the defendants used "a specially cultivated cadre of real estate agents, loan brokers, and other persons (hereinafter 'runners') with ties to the African American community requesting that they steer borrowers to Capital City in return for lucrative commissions that often exceeded 8 percent of the borrower's loan." Complaint at ¶ 104. Plaintiffs assert in their opposition that "certain brokers engaged in regular transactions with Capital City and Nash." Opposition at 36. They support this assertion with a deposition from Harry McGee, who admits that he placed some borrowers with Capital City, and charged a 10% fee. *See* McGee Depo. at 55–56 (referring to "some" loans, but later de-emphasizing his

emotional distress, which are not recoverable under RICO. However, summary judgment will be granted for the defendants as to the Greater Little Ark plaintiffs' RICO claims be-

cause the claims do not fall within the statute of limitations, which obviates the need to reach these issues.

involvement, saying "a couple of deals I gave to [Nash]. That's about it."). Mr. McGee makes reference to four brokers who worked with the defendants, and Nash in particular, indicating that Clayton, Powell, Butler, and Laws "were his broker dudes" and that they "were special with him." *Id.* at 105–06. Although the time frame remains unclear, plaintiffs have shown that there is a genuinely disputed issue of fact as to whether or not certain brokers, along with Nash and Capital City, formed a "core of constant personnel."[15]

Defendants also argue that plaintiffs have not shown a hierarchy of control for the alleged "association in fact." On the contrary, plaintiffs have alleged that Nash and Capital City controlled the affairs of the organization, financing the loans and making decisions regarding their terms, and the brokers brought potential borrowers to the defendants and were paid for their efforts. Defendants do not appear to challenge those facts beyond arguing that the brokers' participation was minimal and sporadic, but in any event, plaintiffs have placed sufficient facts in evidence to avoid summary judgment on that point.

Finally, Defendants cite to *Danielsen*, 941 F.2d 1220, *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs and Helpers Local Union 639*, 913 F.2d 948 (en banc) (D.C.Cir.1990), and *Reves v. Ernst & Young*, 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), for the proposition that plaintiffs failed to allege that Mr. Walker and other non-defendant participants in the enterprise "in any way managed or directed the enterprise." However, those cases involved liability under section 1962(c), not the definition of an enterprise under section 1961(4). They require only that *defendants* manage the en-

terprise. The "defendant must have not merely participated in the enterprise's affairs, but in the conduct of the enterprise's affairs" which "requires participation in the operation or management of the enterprise itself." *Danielsen*, 941 F.2d at 1231 (internal quotations omitted; citing *Yellow Bus*). Although the plaintiffs argue, in the alternative, that the non-defendant participants participated in the management of the enterprise, *see Reves, 113 S.Ct. 1163*, 507 U.S. at 184, they were not required to make such a showing.

b. Corporate Enterprise

The second count is premised on the assertion that Capital City is a corporate RICO enterprise, and Nash is a person associated with that enterprise. *See* 18 U.S.C. § 1961(4) (enterprise may be a corporation). Accordingly, this count is only brought against Nash. Defendants argue that the alleged "pattern of racketeering" is not "separate and apart" from the enterprise, because the complaint alleges that Capital City engaged in illegal acts, and does not allege that Capital City engaged in any other legal activities. Plaintiffs allege that Capital City is a Maryland corporation, which is enough to establish that it is an enterprise. It is not necessary to establish that the enterprise "does something other than commit predicate acts." *Perholtz*, 842 F.2d at 363; *see also United States v. White*, 116 F.3d 903, 924 (D.C.Cir.1997)("the existence of the enterprise may be inferred from proof of the pattern" of racketeering).

ii. Pattern

The alleged racketeering activity is mail fraud. *See* 18 U.S.C. § 1341.

---

15. Defendants make the additional argument that the brokers acted on behalf of the borrowers, not on behalf of the defendants. However, considering the evidence in the light most favorable to the plaintiffs, the high fees charged and the allegations that the brokers were cultivated as members of the organization create a genuine dispute of fact.

In addition to at least two predicate acts, the plaintiffs must show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Defendants argue that multiple mailings do not establish the pattern and continuity necessary to establish a RICO claim. However, plaintiffs have alleged multiple frauds, occurring over a period of years, which are clearly related by purpose and method. The alleged acts were connected because they were part of the defendants' ongoing business of extending and servicing loans.

### iii. Damages

The defendants argue that punitive damages, damages for physical or emotional injuries, and injunctive relief are not available under RICO. Defendants devote only one paragraph of their motion to these broad contentions, and in their opposition plaintiffs neither acknowledge nor make any attempt to counter defendants' position. It is not possible to determine from the complaint whether the plaintiffs intend to seek these types of relief for their RICO counts, although in their general prayer for relief, based on all counts, they do request such relief.

▮▮▮ Defendants broadly assert that "a RICO plaintiff is not entitled to recover for physical or emotional injuries," but the law in this area is not so clear. Section 1964(c) provides for recovery only for "any person injured in his business or property." The Supreme Court has stated that Congress' limitation of recovery to business or property injury "retains restrictive significance. It would for example exclude personal injuries suffered." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). However, there is

significant dispute as to the scope of compensable business or property injury. For example, it may be possible for pecuniary losses associated with personal injury to be sufficiently related to "property" injury so as to permit recovery. See *Nat'l Asbes. Workers Med. Fund. v. Philip Morris*, 74 F.Supp.2d 221, 228 (E.D.N.Y.1999) (finding injuries resulting from tobacco related illnesses compensable); *Guerrero v. Gates*, 110 F.Supp.2d 1287, 1291–92 (C.D.Cal. 2000) (finding that pecuniary losses stemming from personal injuries are compensable under RICO). Thus, whether the plaintiff is entitled to compensation may depend on the particular type of damages sought by the plaintiff. Without further explication by the parties, the Court cannot determine whether the plaintiff intends to seek non-compensable personal or emotional injuries.

The law regarding whether private plaintiffs may seek injunctions based on RICO claims is even more murky. *Compare Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1088–89 (9th Cir.1986) (holding that injunctive relief was not available under RICO); *and Dan River, Inc. v. Icahn*, 701 F.2d 278, 290 (4th Cir. 1983) (noting "substantial doubt about whether RICO grants private parties . . . a cause of action for equitable relief"); *with Aetna Cas. & Sur. Co. v. Liebowitz*, 570 F.Supp. 908, 910–11 (E.D.N.Y.1983) (reasoning that Congress did not intend "to deprive the district court of its traditional equitable jurisdiction" to grant injunctive relief for alleged violations of RICO statute), *aff'd on other grounds*, 730 F.2d 905 (2d Cir.1984); *and Nat'l Org. of Women v. Scheidler*, 897 F.Supp. 1047, 1082 (N.D.Ill. 1995) (finding that private parties may seek injunction under RICO).

Defendants also argue that punitive damages are unavailable. While some courts have ruled that punitive damages

are unavailable, *see Moravian Development Corp. v. Dow Chemical Co.*, 651 F.Supp. 144, 149 (E.D.Pa.1986), in cases involving claims under both RICO and other causes of action, courts have permitted punitive damage awards. *See Bingham v. Zolt*, 823 F.Supp. 1126 (S.D.N.Y.1993) (holding that punitive damages are unavailable for RICO claims, but permitting a (reduced) punitive damage award pursuant to another claim) *aff'd* 66 F.3d 553 (2d Cir.1995); *Al–Kazemi v. General Acceptance & Investment Corp.*, 633 F.Supp. 540, 543–44 (D.D.C.1986) (lowering, but permitting, a punitive damage award in addition to a RICO treble damage award); *see also First American Corp. v. Al–Nahyan*, 948 F.Supp. 1107, 1122 (D.D.C.1996) (treble damage provision of RICO may suggest a punitive element).

Given the complicated nature of these issues, and the doubt as to whether the plaintiffs actually intend to seek these types of relief, the portion of defendants' motion regarding the relief available under RICO is denied without prejudice.

### F. Fraud

A fraud claim in the District of Columbia must be plead with particularity and proven by clear and convincing evidence, and requires proof of:

> (1) a false representation (2) made in reference to a material fact, (3) with knowledge of its falsity, (4) with the intent to deceive, and (5) an action that is taken in reliance upon that representation.

*Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916, 923 (D.C.1992). Where the transaction is commercial, reliance must be reasonable. *See id.*

#### i. The Hilliard and Birth Loan

The defendants argue that the Hilliard and Birth plaintiffs have neither alleged nor shown evidence of any misrepresentation. They contend that the terms of the contracts, notes, and deeds of trust were clearly spelled out, and that the plaintiffs are bound by the contracts they signed. They point out that the contracts themselves instructed borrowers to seek legal counsel if they did not understand the contract terms. Plaintiffs counter that Ralph Conley, Capital City's agent, misrepresented the amount of the monthly payment for the property. *See* Hilliard Depo. at 51–53 (monthly payment would be $794, rather that the $2,382 required under the three notes). Plaintiffs submit that Conley told them that they could sustain the monthly payments, even though he knew that their joint monthly income was significantly less than the monthly payments on the loan. Plaintiffs also offer evidence that Mr. Conley falsely told Hilliard and Birth that the lien placed on their home would expire after six months. The plaintiffs have alleged the misrepresentations with particularity, and have supported their allegations.

Defendants also argue that Nash is not individually liable because he had no direct contact with Hilliard or Birth until long after the settlement of the purchase, and the person who made representations to these plaintiffs, Ralph Conley, was Capital City's agent rather than Nash's agent. Plaintiffs argue that Nash's liability is premised on his role in Capital City as both president and, through Mortgage Banking Trust, owner. As such, Nash directs and controls business and policy decisions regarding the issuance of loans and their terms. He signed the contract for the sale of the property. He hired Mr. Conley to list the property, and received information from Mr. Conley regarding Hilliard and Birth's financial status before extending the loan. Plaintiffs also provide some evidence suggesting it was Nash's

decision to split the loan into multiple notes. *See* Plaintiffs' Statement ¶ 55; Kuhn Depo. 625. The allegation that Nash, while aware of the plaintiffs inability to pay, made the decision to split the loan into three parts gives rise to a strong inference of his participation in the alleged fraud. Plaintiffs have sufficiently alleged a claim of fraud against Nash. *Cf. Vuitch v. Furr*, 482 A.2d 811(D.C.1984) (liability of corporate officers for torts they participate in or inspire).

### ii. The Robinson Loan

■■■ Defendants argue that Robinson has established only a breach of contract claim, not a fraud claim. They argue that the only alleged misrepresentation was that Nash agreed to install a new roof on the property, and that the contract language indicated "seller will install a new roof." Robinson alleges that Nash did not provide a new roof, but instead merely patched over the existing roof. There is a dispute as to what "new roof" means, as the defendants argue that the terms of contract were complied with.[16] The defendants argue that they had no duty to disclose their intentions, therefore any omissions were not fraudulent. As to Nash's statements to Robinson, they argue that such a "promissory representation" would have to be contrary to the terms of the contract in order to establish fraud. These arguments might be successful if defendants' intent had been to comply with the terms of the contract as they understood them. However, plaintiffs allege that the defendants "never intended to perform their contractual obligations." A misrepresentation of present intent to per-

form an act is an actionable misrepresentation. *See Chedick v. Nash*, 151 F.3d 1077, 1081 (D.C.Cir.1998) (citing *Bennett v. Kiggins*, 377 A.2d 57 (D.C.1977)). There is a dispute of fact as to the defendants' understanding of what installing a "new roof" required; therefore summary judgment would be inappropriate.[17]

### III. Motions to Sever the Claims, for Separate Trials, and to Transfer

■■■ The defendants have moved to sever the plaintiffs' claims into five separate claims and five separate trials, one based on each of the four loans, and one based on the FHC's claims. Under Rule 42(b) this Court has the discretion to order separate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Fed.R.Civ.P. 42(b); *see also American Nat'l Red Cross v. Travelers Indem. Co.*, 924 F.Supp. 304, 306 (D.D.C.1996) (trial court has broad discretion). Additionally, defendants point out that Rule 21 permits claims to be severed. *See* Fed.R.Civ.P. 21 (regarding misjoinder and non-joinder of parties). The plaintiffs' claims involve common questions of law and fact, as the issues discussed in this Opinion illustrate. Although the claims involve some distinct facts, i.e. the loans, the claims also involve issues in common because they are predicated on the ongoing patterns and practices of the defendants operations. Plaintiffs indicate that their proof will be interwoven, particularly as to the expert witness testimony regarding patterns of racially discriminatory lending. Convenience and expediency,

---

16. Recognizing the dispute of fact, defendants do not argue for summary judgment on the breach of contract claim.

17. Defendants also challenge Robinson's reliance on the misrepresentation, and argue that she cannot prove damage. Robinson indicates that her decision to buy the home, and take the loan, was premised on the misrepresentation. She alleges damages consisting of the costs associated with installing a new roof.

therefore, weigh in favor of a joint trial. Prejudice to a party is enough to warrant a separate trial in some circumstances, and defendants have alleged prejudice. Yet, in this case there are distinct advantages in having the claims tried together, including the minimization of expense and delay, and the convenience of the parties and the Court. *See* 9 Charles Alan Wright, Arthur R. Miller, *Federal Practice and Procedure (2d)* § 2388 (1995). The defendants have not shown that, with appropriate instructions, a jury would be unable to fairly judge each separate claim on its merits. The motion to sever the claims and for separate trials is denied.

▆▆▆▆ The defendants have also moved to transfer the case to the United States District Court for Maryland. The Court has broad discretion to transfer a case "for the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). The defendants assert that Maryland is an appropriate and convenient forum for the case, and they argue that because a series of articles published in the Washington Post has created prejudice against them, and because there are "sensitive issues of race," the case should be transferred. It is obvious that the Washington Post is widely distributed in Maryland as well as in the District of Columbia. Defendants have not shown

that a jury selected from the citizens of District of Columbia would not be impartial, or that the jurors would be unable to follow the evidence and the Court's instructions. *See, e.g., United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976).[18] The motion to transfer is denied.[19]

It is therefore

**ORDERED** that summary judgment is granted for the defendants as to the RICO claims (Counts I and II) of Walter Jamison, Sr., Clyde Hargraves, Erlinda Cooper, and the Greater Little Ark Baptist Church; it is

**FURTHER ORDERED** that summary judgment is granted for the defendants as to Walter Jamison, Sr.'s claim under 42 U.S.C. § 3604; it is

**FURTHER ORDERED** that defendants' summary judgment is denied, without prejudice, as to defendants' request for a ruling that damages for physical and emotional injuries, punitive damages, and injunctive relief are unavailable for RICO claims; it is

**FURTHER ORDERED** that, in all other respects, defendants' motion for summary judgment is denied; it is

**FURTHER ORDERED** that defendants' motion to preclude evidence of emotional distress is denied; it is

**18.** Plaintiffs also correctly assert that their choice of forum is to be given significant weight. *See, e.g., Shapiro, Lifschitz & Schram v. Hazard,* 24 F.Supp.2d 66, 71 (D.D.C.1998).

**19.** One motion remains for the Court to address. Defendants filed a separate motion to preclude plaintiff Robinson from offering any evidence of emotional distress at trial. Defendants indicate that they arranged for all of the individual plaintiffs to be examined by Dr. Kleinman, with regard to their emotional distress claims. Defendants scheduled two appointments for Robinson to be examined, but Robinson failed to appear for either of them.

She indicates that she missed the first appointment due to her failure to record the correct date in her appointment calendar. Due to severe weather on the second date, the public schools were closed, and Robinson had to stay home with her children. Two missed appointments are not sufficient to warrant the severe sanction of barring evidence of damage at trial. *See Webb v. District of Columbia,* 146 F.3d 964, 971 (D.C.Cir.1998). If defendants have not been able to accomplish the desired examination, the Court will entertain a motion requesting another opportunity to do so promptly.

**FURTHER ORDERED** that defendants' motion to sever the claims and for separate trials is denied; and it is

**FURTHER ORDERED** that defendants' motion to transfer the case to the United States District Court of Maryland is denied.

IT IS SO ORDERED.