**Reginald McGLAWN, Petitioner**

v.

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

**McGlawn & McGlawn, Petitioner**

v.

**Pennsylvania Human Relations Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 14, 2005.

Decided Jan. 13, 2006.

Reargument Denied March 6, 2006.

Jeffry H. Homel, Huntingdon Valley, for petitioner.

Charles L. Nier, III, Asst. Chief Counsel, Philadelphia, for respondent.

BEFORE: McGINLEY, Judge, and COHN JUBELIRER, Judge, and SIMPSON, Judge.

OPINION BY Judge SIMPSON.

This case involves an issue of first impression: whether the Pennsylvania Human Relations Act (Act)[1] extends to a mortgage broker's predatory lending activities known as "reverse redlining."[2] We affirm the Commission's holding that the Act prohibits reverse redlining. However, we vacate part of the Commission's award of actual damages and remand for further proceedings.

Respondent McGlawn and McGlawn, Inc. (Broker) a state-licensed mortgage broker, and Respondent Reginald McGlawn (Reginald McGlawn) petition for review of the decision of the Pennsylvania Human Relations Commission (Commission). The decision held Respondents violated Sections 5(h)(4)(loan provision)[3] and 5(h)(8)(i)(real estate transaction provision)[4] of the Act by discriminating against Complainants and other similar situated persons (collectively, Complainants),[5] in mortgage loan transactions, because of their race and the racial composition of their neighborhoods. The Commission's final order directed Respondents to (1) cease and desist from discriminating against African Americans because of their race; (2) pay Complainants actual damages;[6] (3) pay Complainants damages for embarrassment and humiliation;[7] and (4)

---

1. Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 851–963.

2. In *United Cos. Corp. v. Sargeant*, 20 F.Supp.2d 192 (D.Mass.1998), the United States District Court defined "redlining" as

the practice of denying the extension of credit to specific geographic areas due to the income, race or ethnicity of its residents. The term was derived from the actual practice of drawing a red line around certain areas in which credit would be denied. Reverse redlining is the practice of extending credit on unfair terms to those same communities.

*Id.* at 203, n. 5.

3. Section 5(h)(4) of the Act, 43 P.S. § 955(h)(4), makes it unlawful to

[d]iscriminate against any person in the terms or conditions of any loan of money, whether or not secured by a mortgage or otherwise for the acquisition, construction, rehabilitation, repair or maintenance of housing accommodation or commercial property because of ... race...."

4. Section 5(h)(8)(i) of the Act, 43 P.S. § 955(h)(8)(i), makes it an unlawful to

[d]iscriminate in real estate related transactions, as described by and subject to the

following: (i)[i]t shall be unlawful for any person or other entity whose business includes engaging in real estate-related transactions to discriminate against any person in making available such a transaction or in the terms [or] conditions of such a transaction because of race...."

5. Complainants are Lucrecia Taylor and Lynn Poindexter. Similarly situated persons are Hawthorne Brunson, Venice Jackson, Jacquline Slaughter, Emma Jacobs, Yvonne Hawkins, Regina Miles, Alfred Watts and Sophie Norwood.

6. The Commission awarded Complainants actual damages in these amounts: Taylor, $45,770.68; Poindexter, $24,447.80; Brunson, $63,996.34; Jackson, $74,875.74; Slaughter, $29,685.46; Jacobs, $47,549.62; Hawkins, $41,952.72; Miles, $101,562.81; Watts, $116,298.87; and Norwood, $154,209.11. Reproduced Record (R.R.) at 57a.

7. The Commission awarded Complainants damages for embarrassment and humiliation in the following amounts: Taylor, $25,000.00; Poindexter, $15,000.00; Brunson, $15,000.00; Jackson, $20,000.00; Slaughter, $20,000.00; Jacobs, $20,000.00; Hawkins, $20,000.00; Miles, $10,000.00; Watts,

pay a civil penalty of $25,000.00. Further, the Commission's order directed Broker to (5) provide employee training to its employees designed to educate them in their responsibility to treat clients in a non-discriminatory manner consistent with the provisions of the Act; and to (6) develop and implement a record-keeping system designed to accurately record information about Broker's charges in all mortgage transactions.[8] The order also required Respondents to report the means of compliance and directed the Commission to contact the Department of Banking so that it may take such licensing action as it deemed appropriate.

## I. Background

### A.

Broker, a corporation which brokers mortgage loans, refinancing and insurance for its customers, was founded in 1985 by its chief officers, Reginald McGlawn, and his brother, Anthony McGlawn. Reginald McGlawn is Broker's mortgage loan specialist, and Anthony McGlawn is Broker's insurance specialist. Broker also employs other McGlawn family members.

Broker specializes in arranging sub-prime mortgage loans for its customers. The prime lending market provides credit to those considered good credit risks. The sub-prime lending market provides credit to people the financial industry considers enhanced credit risks. These people generally have a flawed credit history or a debt-to-income ratio outside the range the financial industry considers acceptable for prime credit. As discussed hereafter, sub-prime interest rates are usually two to

three percentage points higher than prime rates.

In 1998–2000, Broker arranged sub-prime mortgage loans for Complainants, who own real property in Philadelphia County. Broker is an African American-owned company. Complainants are African Americans who reside in predominantly African American neighborhoods.

In April 2001, Complainant Lucrecia Taylor (Taylor) filed a verified complaint with the Commission alleging Broker unlawfully discriminated against her in the terms and conditions of a real estate-related transaction and loan of money because of her race and the racial composition of her neighborhood, African American. Specifically, Taylor alleged Broker targeted her, as an African American, for a mortgage loan transaction containing predatory and unfair terms in violation of the Act's loan and real estate transaction provisions. Significantly, Taylor stated her allegations were made not only on her own behalf, but on behalf of all other similarly situated persons affected by Broker's discriminatory practices. After the pleadings were closed, the Commission notified Taylor and Broker that probable cause existed to credit Taylor's allegations.

In August 2002, Complainant Lynn Poindexter (Poindexter) filed a like complaint against Broker on behalf of herself and all other similarly situated persons. The Commission subsequently found probable cause existed to credit Poindexter's allegations. The Commission consolidated the two cases.

Because these complaints alleged Broker committed similar discriminatory acts against other persons, the Commission

$20,000.00; and Norwood, $20,000.00. R.R. at 58a.

8. In particular, Broker must accurately record the following data for each transaction:

(a) the dollar amount and percentage of the broker's fee charged; (b) any other fees paid; (c) the amount and type of the loan; and (d) the employee involved in the transaction. Broker shall submit this information to the

sought access to Brokers loan records. Broker ignored this request. Thereafter, Broker refused to comply with a Commission subpoena requesting these documents. This Court entered an order directing Broker to produce such documents. Broker complied.

The Commission was thereafter able to identify other individuals affected by Broker's alleged discriminatory practices. Pursuant to 16 Pa.Code § 42.36(a), Commission Counsel,[9] representing Complainants and the Commonwealth's interest, filed a confirmation of intention to seek relief for persons other than the named Complainants.

Several weeks later, after failed attempts to resolve the matter, hearings were held before a panel of three Commissioners. Both Complainants and Broker presented evidence.

Complainants testified and submitted exhibits, including their loan documents. Complainants also presented testimony from a Commission investigator and two experts regarding the rapid growth of the urban sub-prime lending market and the emerging problem of predatory lending targeting segregated urban areas.

In defense, Broker submitted documentary evidence and presented testimony from Reginald McGlawn and Anthony McGlawn. Broker also presented testimony from two witnesses satisfied with Broker's services.

### B.

In its decision, the Commission found Broker engaged in predatory brokering activities regarding all Complainants. Those actions resulted in unfair and predatory mortgage loans. It also found Broker engaged in an aggressive marketing plan targeting African Americans and African American neighborhoods in the Philadelphia area. Nearly all of Complainants contacted Broker in response to radio, television and newspaper advertisements.

Broker's predatory practices, the Commission noted, included arranging loans containing onerous terms such as high interest rates, pre-payment penalties, balloon payments and mandatory arbitration clauses. In addition, Broker charged Complainants high broker fees, undisclosed fees, yield spread premiums and various other additional closing costs. Broker's predatory practices also included falsification of information on loan documents, failure to disclose information regarding terms of the loan, and high pressure sales tactics.

Because there are no state appellate court decisions addressing the issue of whether reverse redlining and/or predatory lending constitutes prohibited housing discrimination under the Act, the Commission relied on several federal court decisions. Those decisions hold reverse redlining and related discriminatory practices violate the Fair Housing Act (FHA), 42 U.S.C. §§ 3601–3631.[10]

Commission on a bi-annual basis for three years.

**9.** The Commission's staff, which includes Commission counsel, is responsible for finding probable cause and prosecuting complaints filed under the Act. *George Clay Steam Fire Engine and Hose Co. v. Pennsylvania Human Rels. Comm'n,* 162 Pa.Cmwlth. 468, 639 A.2d 893 (1994). Here, Commission Counsel prosecuted this case on behalf of Complain-

ants. The Commissioners function as an impartial tribunal and have no prosecutorial role. *Id.*

**10.** In *Honorable v. Easy Life Real Estate Sys.,* 100 F.Supp.2d 885 (N.D.Ill.2000), the Court recognized the FHA prohibits discriminatory practices such as reverse redlining, mortgage redlining, insurance redlining, racial steering and other practices directly affecting the availability of housing to minorities.

The seminal case prohibiting reverse redlining is *Hargraves v. Capital City Mortgage Corp.,* 140 F.Supp.2d 7 (D.D.C. 2000). There, the United States District Court adopted a two-pronged test for discrimination under the FHA based on reverse redlining. First, the plaintiffs must establish the defendant's lending practices and loan terms were predatory and unfair. *Hargraves.* Second, the plaintiffs must establish that defendant intentionally targeted them because of their race or that the defendant's lending practices had a disparate impact on the basis of race. *Id.*

Citing *Hargraves* and the opinions of Complainants' experts, the Commission concluded Complainants established a prima facie reverse redlining claim against Broker under the *Hargraves* test. The Commission rejected Broker's arguments that (1) it did not discriminate because it did not arrange loans for non-African Americans on more preferable terms, (2) it had a legitimate business necessity for its actions, (3) it is not responsible for the terms and conditions of the loans or the disclosure of information relating to the loans, and (4) all mortgage brokers are predators.

■ As a result, the Commission held Respondents violated the loan provisions and the real estate transaction provisions of the Act by unlawfully discriminating against Complainants in the terms and conditions of real estate-related transactions. The Commission therefore entered the order previously described, and Respondents' petitioned this Court for review.[11]

Before this Court, Respondents raise three primary contentions. First, Respondents challenge the Commission's authority to implement a new cause of action for discrimination for reverse redlining under the loan provisions and real estate transaction provisions of the Act. Second, Respondents challenge support for the conclusion that Broker engaged in reverse redlining. Third, they challenge the damage award as excessive and not reasonably related to the alleged harm.

## II. Cause of Action

■ Respondents first argue the Commission lacked the jurisdiction and authority to create a cause of action for reverse redlining under the Act. They contend the Commission's authority is limited by the Act. Any doubtful powers do not exist. Respondents maintain it is the responsibility of courts, not the Commission, to recognize a new cause of action.

In response, the Commission contends this is a housing discrimination case. Section 3 of the Act recognizes an individual's civil right to obtain any housing accommodation without discrimination because of race. 43 P.S. § 953. The Act is an exercise of the Commonwealth's police power "for the protection of the public welfare, prosperity, health and peace of the people of the Commonwealth...." Section 2(c) of the Act, 43 P.S. § 952(c).

In *City of Pittsburgh Comm'n on Human Rels. v. DeFelice,* 782 A.2d 586 (Pa. Cmwlth.2001), we recognized the Commission was established to carry out the purposes of the Act. As the Commission's

---

11. Our review of a Commission decision is limited to determining whether the Commission's findings of fact were supported by substantial evidence, whether an error of law was committed or whether constitutional rights were violated. *Parks v. Pennsylvania Human Rels. Comm'n,* 848 A.2d 204 (Pa.Cmwlth.

2004). Where the Commission's findings are supported by substantial evidence and in accordance with the law, they may not be disturbed. *Pennsylvania Human Rels. Comm'n v. Johnstown Redevelopment Auth.,* 527 Pa. 71, 588 A.2d 497 (1991).

power is delegated to it by the General Assembly, we must strictly construe the limits of the Commission's power. *Id.*

Section 7 of the Act enumerates the Commission's powers and duties. 43 P.S. § 957. Section 7(f) authorizes the Commission to initiate, receive and investigate complaints charging unlawful discriminatory practices. 43 P.S. § 957(f). Section 7(g)(1) authorizes the Commission to hold hearings, subpoena witnesses and take testimony related to any matter under investigation where a complaint is filed. 43 P.S. § 957(g)(1). *See also McGraw–Edison Co. v. Pennsylvania Human Rels. Comm'n,* 108 Pa.Cmwlth. 147, 529 A.2d 81 (1987).

In addition, Section 6(b)(1) of the Act authorizes the Commission to investigate whenever a verified complaint indicates there is reason to believe an unlawful discriminatory practice was committed. 43 P.S. § 956(b)(1). Section 6(d) authorizes the Commission to prosecute cases of unlawful discrimination and hold evidentiary hearings. 43 P.S. § 956(d). Section 9(f)(1) authorizes the Commission to enter cease and desist orders, to award damages and to require affirmative remedial action to carry out the Act's purposes. 43 P.S. § 956(f)(1).

Reverse redlining is a recognized, if new, form of housing discrimination. *Hargraves.* Section 5(h) of the Act, 43 P.S. § 955(h), addresses housing discrimination. Section 5(h)(4), the loan provision, prohibits discrimination "against any person in the terms and conditions of any loan of money, whether or not secured by mortgage or otherwise for the acquisition, construction, rehabilitation, repair or maintenance of housing accommodation[s]. . . ."

43 P.S. § 955(h)(4). Further, Section 5(h)(8)(i), the real estate transaction provision, makes it unlawful for a business engaged in real estate-related transactions to discriminate in the terms and conditions of those transactions.

In view of the foregoing, we conclude under the Act, the Commission has both the jurisdiction and the authority to investigate, prosecute and remedy unlawful housing discrimination practices in the Commonwealth, including claims of reverse redlining. *DeFelice.* Respondents' contrary assertion lacks merit.

Respondents contend, however, the Commission impermissibly broadened the scope of the Act by creating a new cause of action for reverse redlining. Conceding this issue is one of first impression in the Commonwealth, the Commission based its decision on federal court decisions on reverse redlining. As discussed above, federal courts conclude reverse redlining is a form of housing discrimination that violates the FHA and other related civil rights statutes.[12] *Hargraves.*

■ In *DeFelice,* this Court recognized it is not bound by federal court decisions. However, in interpreting the Act where no applicable state law exists, "it is appropriate to look to federal decisions involving similar federal statutes for guidance." 782 A.2d at 592, n. 8. Here, based on the similarities between the FHA and the Act, we are persuaded to adopt the reasoning of the federal court and to apply it to the Act.

The FHA and the Act share the objective to prohibit discrimination. In particular, like the FHA, Section 2(a) of the Act

**12.** The federal courts have also determined reverse redlining violates Section 1982 of the Civil Rights Act, 42 U.S.C. § 1982 (all citizens have the same right to purchase lease sell hold and convey real and personal property).

*Hargraves.* In 1994, in order to combat predatory lending, the U.S. Congress enacted the Home Ownership and Equity Protection Act, 15 U.S.C. §§ 1602(aa) and 1639.

recognizes that housing discrimination is injurious to the public health and leads to racial segregation and its related evils. 43 P.S. § 952(a).

Also, the FHA and the Act share language addressing discrimination in real estate transactions. Section 3605(a) of the FHA provides "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race...." 42 U.S.C. § 3605(a). Importantly, the real estate transaction provision of the Act contains identical language.

In *Hargraves*, the District Court determined housing discrimination in the form of reverse redlining is prohibited under Section 3605(a) of the FHA. In light of the shared objectives of the FHA and the Act, to ban housing discrimination, and the identical language in both statutes prohibiting discrimination in real estate-related transactions, we agree with the Commission that the Act provides a cause of action for discrimination based on reverse redlining.

Further, given the similarity in statutory language addressing discrimination in loans, the loan provisions of the Act provide a cause of action for reverse redlining. The Act's loan provisions prohibit discrimination in the terms and conditions of loans for housing construction, rehabilitation, repair and maintenance. Correspondingly, Section 3605(b) of the FHA defines a "resi-

dential real estate-related transaction" in relevant part as the "making or purchasing of loans or providing other financial assistance ... for purchasing, improving, repairing, or maintaining a dwelling; ... secured by real estate." 42 U.S.C. § 3605(b).[13]

For the foregoing reasons, we reject Respondents' challenges to the Commission's decision based on jurisdiction and authority to address a claim of reverse redlining.

## III. Substantial Evidence

■ Respondents next challenge support for the Commission's findings. They assert the Commission's conclusion Broker engaged in reverse redlining is not supported by substantial evidence.[14] In particular, Respondents maintain the evidence does not show Broker engaged in predatory lending practices or targeted African Americans.

■ "It is well settled that the party asserting discrimination bears the burden of proving a prima facie case of discrimination." *DeFelice*, 782 A.2d at 591. "Once a prima facie case is established, a rebuttable presumption of discrimination arises." *Id.* "The burden then shifts to the defendant to show some legitimate, nondiscriminatory reason for its action." *Id.*

■ To establish a discrimination claim based on reverse redlining, the plaintiff must show "the defendants' lending practices and loan terms were 'predatory' and 'unfair.'" *Hargraves*, 140 F.Supp.2d at 20.

13. Section 5(h)(4), as the Commission notes, provides broader coverage than Section 3605 of the FHA. It prohibits discrimination in the terms and conditions of loans related to both residential and commercial properties.

14. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Assoc.*

*Rubber, Inc. v. Pennsylvania Human Rels. Comm'n*, 872 A.2d 864, 870 n. 9 (Pa.Cmwlth. 2005). "Further, substantial evidence supporting a finding of racial discrimination may be circumstantial and based on inferences." *Consumers Motor Mart v. Pennsylvania Human Rels. Comm'n*, 108 Pa.Cmwlth. 59, 529 A.2d 571, 574 (1987).

The plaintiff must also show "the defendants either intentionally targeted on the basis of race, or that there is a disparate impact on the basis of race." *Id.*

## A. Predatory Lending

Respondents first argue Broker did not engage in predatory or unfair lending practices because it did not approve Complainants' loans or lend them the money. Therefore, they were not responsible either for the terms and conditions of Complainants' loans or for the disclosure of information related to the loans. Those responsibilities belong to the lending institutions that set the terms and approved the loans.

The Commission accepted the testimony of Complainants' expert witnesses. Michelle Lewis, President and Chief Executive Officer of Northwest Counseling Service, Inc. (Complainants' first expert),[15] stated that a mortgage broker is significantly involved in making the loan. Reproduced Record (R.R.) at 290a. The broker is the middleman who creates the loan opportunity. *Id.* The broker's customer relies on the broker's expertise in lending matters and has an expectation that the broker will be able to obtain the best available deal. R.R. at 294a.

The Commission also relied on Ira Goldstein, Director of Public Policy and Program Assessment for the Reinvestment Fund (Complainants' second expert),[16] who testified that, in brokered transactions, the broker's customer-the borrower, never actually meets the lender. R.R. at 1005–06a. As a result, in the borrower's mind, the broker is the lender. R.R. at 1006a. Complainants' second expert also testified that in loan transactions where a yield spread premium[17] is used, the broker plays a significant role in establishing the interest rate of the loan. R.R. at 1007a.

As additional support for its determination, the Commission cited Reginald McGlawn's testimony. He testified, "[W]hen people come to us, I provide loans." R.R. at 1233a. Reginald McGlawn also testified he chooses which lender receives the borrower's loan application. R.R. at 1317a. He also stated he sets the broker fee and gives the borrower the option of using a yield spread premium, which has the effect of increasing the interest rate. R.R. at 1324–26a.

### 1.

■ There is substantial evidence to support the Commission's determination that Respondents engaged in brokering

---

**15.** Complainants' first expert is a real estate broker/appraiser and certified fraud examiner. She created and served as chairperson of the Philadelphia Predatory Lending Task Force. She has testified numerous times in federal court as an expert on predatory lending.

**16.** Complainants' second expert worked for the United States Department of Housing and Urban Development (HUD) as Director of Fair Housing for the Middle Atlantic Region, which included Pennsylvania, Delaware and Maryland. At HUD, Complainants' second expert participated in several predatory lending investigations of corporate entities.

**17.** In *Taylor v. Flagstar Bank, FSB*, 181 F.R.D. 509 (M.D.Ala.1998), the United States District Court defined "yield spread premiums" as:

payments made by a mortgage lender to a mortgage broker on an "above par" loan brought to the lender by the broker. To be "above par" is to be above the going rate, to be above the lowest rate that a lender will offer without charging "discount points." In crude terms, therefore, the yield spread premium is (allegedly) simply a payment made by the lender to the broker in return for the broker having brought the lender a high interest loan.
181 F.R.D. at 511.

activities that resulted in predatory and unfair loans.

First, it is noted that a mortgage broker owes a fiduciary duty to its customers. *See In re Barker,* 251 B.R. 250 (Bankr.E.D.Pa.2000) (mortgage broker is borrower's agent; borrower has a reasonable expectation broker will attempt to secure the most advantageous loan for borrower).

Second, application of the loan and real estate transaction provisions of the Act are not restricted to a lending institution. Rather, the provisions apply to any "person," which is defined to specifically include a "broker, salesman, agent. . . ." Section 4(a) of the Act, 43 P.S. § 954(a).

Third, Broker's activities were a substantial part of the loan transactions at issue. In particular, Broker selected which lender received Complainants' loan applications. Broker was the sole negotiator for Complainants with the ultimate lender. Also, Broker influenced the ultimate interest rates in loans involving yield spread premiums. Further, Broker received substantial sums directly from loan proceeds, such as broker fees and insurance premiums. As the Commission properly concluded, these items are considered terms of a loan transaction.

Given a broker's legal duty to its customers, the specific inclusion of brokers in the scope of the Act, and the way Broker operated here, we discern no error in the Commission's finding on this issue.

**2.**

We next review the Commission's determination that Respondents' practices were predatory and unfair. Whether lending practices are predatory and unfair is a question for the fact finder. *Hargraves.*

In finding Broker arranged predatory and unfair loans for Complainants, the Commission applied the *Hargraves* definition of "predatory lending practices." The *Hargraves* Court stated predatory lending practices are indicated by loans with unreasonably high interest rates and loans based on the value of the asset securing the loan rather than the borrower's capacity to repay it. The Court also recognized predatory lending practices include "loan servicing procedures in which excessive fees are charged." 140 F.Supp.2d at 21.

The Commission also noted the New Jersey Superior Court's decision in *Assocs. Home Equity Servs., Inc. v. Troup,* 343 N.J.Super. 254, 778 A.2d 529 (2001). The *Troup* Court explained the term "predatory lenders" refers to those lenders who target certain populations for credit on unfair or onerous terms. Characteristically, predatory loans do not fit the borrower either because the borrower's needs are not met or because the terms are so onerous there is a strong likelihood the borrower will be unable to repay the loan. *Id.*

In determining what lending practices are predatory and unfair, the Commission also accepted as credible Complainants' experts opinions as to what constitutes a predatory loan. Complainants' first expert testified there are a number of loan features which are characteristic of a predatory loan. They include high interest rates, paying off a low interest mortgage with a high interest mortgage, payment of points, yield spread premiums, high broker fees, undisclosed fees, balloon payments, pre-payment penalties, arbitration clauses and fraud. R.R. at 268–75a. A predatory and unfair loan may include any combination of these characteristics. *Id.* at 275a. *See also In re Barker* (Pennsylvania's Credit Services

Act (CSA) [18] and Unfair Trade Practices and Consumer Protection Law (UTP–CPL) [19] prohibit loan brokers from making false or misleading representations or engaging in deceptive or fraudulent conduct).

Complainants' second expert testified that, even assuming a borrower is an enhanced credit risk, the difference in interest rates between a sub-prime and prime market loan is usually no greater than three percentage points. R.R. at 940. Anything higher than a three-point difference is indicative of a predatory loan. R.R. at 940–41. This expert also testified predatory loan practices include, among other things: flipping (successive refinancing of the same loan); hiding critical terms, establishing loan terms the borrower cannot meet; packing (including unnecessary products such as insurance policies); charging improper fees for items outside the settlement sheet; creation of false documents; and failing to advise borrowers of their rescission rights. R.R. at 908–13a.

The Commission examined the terms of Complainants' loans and their experiences with Respondents in light of the foregoing. We briefly review the Commission's findings regarding Complainants Taylor and Poindexter.

**■ Taylor.** Taylor contacted Broker in October 2000 in order to obtain a refinancing loan of $10,000.00 to make some emergency home repairs (leaky roof, doors and windows, plumbing repair). R.R. at 361–62a. In 2000, she owed $7,300.00 on her home. R.R. at 359a. Her home mortgage had a 3% interest rate with a monthly payment of· $110.90. *Id.* Taylor's sole income source was social security disability. R.R. at 362a.

Broker arranged a 30–year mortgage loan for Taylor with Delta Funding Corporation (Delta) in the amount of $20,500.00 with a 13.09% interest rate. R.R. at 681–82a. Taylor was not given an opportunity to review any of the documents before signing them. R.R. at 381–82a. Taylor was told to sign the documents. R.R. at 382a.

The Commission found Taylor's loan transaction had several predatory characteristics. Taylor's was charged $4,276.60 in total settlement costs, ˈor approximately 20% of the loan.[20] R.R. at 682a. Two days after Taylor signed the loan documents, her uncle reviewed them and advised her to cancel the loan. R.R. at 382–83a. Taylor called Aaron McGlawn, a Broker employee, and stated she did not want the loan. He did not advise Taylor she

---

18. Act of December 16, 1992, P.L. 1144, *as amended*, .73 P.S. §§ 2181–2192. Section 8(c)(2) of the CSA provides "[n]o loan broker shall ... [m]ake or use any false or misleading representations or omit any material fact in the offer or sale of the services of a loan broker or engage directly or indirectly in any act that operates or would operate ˈas fraud or deception upon any person in connection with the offer or sale of the services of a loan broker...." 73 P.S. § 2188(c)(2).

19. Act of December 17, 1968, P.L. 1224, *as amended*, 73 P.S. §§ 201-1—201-9.3.

20. Taylor was charged $440.00 for a broker fee and $410.00 for a yieldˌspread premium.

R.R. at 682. Taylor testified she was unaware her loan contained a yield spread premium or that it would raise her interest rate. R.R at 381a. Her loan also included a $370.31 charge for a homeowner's insurance policy even though she was covered by another policy. R.R. at 682a. Taylor was unaware of this charge and stated her house was already insured. R.R. at 371a. Taylor's settlement sheet also reflected charges for debts she did not owe at the time of closing, including a $83.81 water bill and two ambulance bills ($477.50 and $250.00). R.R. at 682a. Though Broker told Taylor this money would be returned to her, she never received it. R.R. at 373–74a.

could legally rescind the loan within a three-day period; rather, he told Taylor she could cancel the loan if she had the money to pay the people Broker already paid. R.R. at 383a.

The settlement sheet indicates Taylor received $8.902.07. R.R. at 681a. At closing, Reginald McGlawn informed Taylor she owed an additional $1,200.00 fee because of where she lived. R.R. at 384a. Anthony McGlawn cashed the check and gave Taylor the money. R.R. at 384–85a. He then asked Taylor for the $1,200.00 fee. R.R. at 385a. Taylor paid the fee out of the cash; but she was not given a receipt. *Id.* This fee was not reflected on the settlement sheet. R.R. at 681–82a.

Complainants' second expert reviewed Taylor's loan transaction. He noted several predatory characteristics. First, Taylor's 13.09% interest rate was substantially above the three-point spread between subprime and prime loans. R.R. at 940–41a. The Commission noted Broker arranged a loan for Taylor at twice the amount she requested and increased her interest rate from 3% to 13.09%. Such loans are considered to be deceptive and detrimental.[21] *In re Barker.* In addition, Taylor's loan included an additional undisclosed $1,200.00 broker fee. R.R. at 941a.

The Commission found Broker engaged in predatory brokering activities on Taylor's behalf. These *Broker actions* resulted in a predatory and unfair refinancing loan. F.F. No. 6. This finding is supported by substantial evidence.

■ **Poindexter.** Poindexter testified by deposition that she acquired her home as a gift from her grandfather and owned

it free and clear. R.R. at 743a. She described the neighborhood as being African American. R.R. at 744a.

In response to a radio advertisement, Poindexter contacted Broker to obtain a small loan to pay off her bills; she did not want a mortgage. R.R. at 745–46a. She eventually met with Reginald McGlawn. *Id.* Poindexter told him she was going to college and working part time at a grocery store. R.R. at 746a.

During their conversations, Reginald McGlawn informed Poindexter she did not make enough money but that he would "take care of things." R.R. at 747a. Broker subsequently submitted documentation to Gelt Financial Corporation indicating Poindexter had a second job as a receptionist with Ivory Towers, Contractors, Inc. R.R. at 762–63a. Poindexter stated she did not prepare these documents, was never employed by Ivory Towers and was unaware of these documents. R.R. at 747–48a.

Poindexter's settlement sheet indicates her loan was approved for $22,400.00. R.R. at 764a. It listed a broker fee of $2,240.00 (10% of the loan amount) and a $423.87 charge for a homeowner's insurance policy. *Id.* Poindexter's loan also contained a balloon payment of $20.193.79 and a pre-payment penalty. R.R. at 750a, 765a, 766–68a. At the time she signed the documents, Poindexter was unaware of either the balloon payment or the pre-payment penalty. *Id.* Prior to settlement, Poindexter never discussed the interest rate with Respondents. R.R. at 751a. She did not have time to review the loan documents before signing them. *Id.*

21. In addition to the higher interest rate, the Commission found Broker's charges for the homeowners' policy and broker fees to be *predatory and unfair.* It also found *Broker's* refusal to either inform Taylor of her rescission rights or permit her to cancel her loan within the three-day rescission period was a predatory practice intended to process the loan transaction despite Taylor's desire to cancel it.

The Commission found Broker engaged in predatory brokering activities regarding Poindexter, which resulted in a predatory and unfair loan. F.F. No. 7. This finding is supported by substantial evidence.

**Similarly situated persons.** The Commission also found Broker engaged in predatory brokering practices on behalf of the eight similarly situated persons (Brunson, Jackson, Slaughter, Jacobs, Hawkins, Miles, Watts and Norwood), which resulted in unfair and predatory loans. F.F. Nos. 8–15. The Commission noted the terms of these individuals' mortgage loans, as well as their factual circumstances, were "disturbingly similar" to those of Taylor and Poindexter. Comm'n Dec. at 21. These findings are also supported by substantial evidence.

In view of the foregoing, we conclude Complainants proved Respondents engaged in predatory and unfair lending practices. Respondents' actions resulted in onerous loans containing terms of a predatory nature designed to benefit Broker, not Complainants. Therefore, Complainants met the first requirement for proving a reverse redlining claim. *Hargraves.*

### B. Intentional Discrimination

 The second element of a reverse redlining claim is a showing that the defendant either intentionally targeted on the basis of race or that there was a disparate impact on the basis of race. *Hargraves.* Here, the Commission determined Broker intentionally targeted African Americans and African American neighborhoods. F.F. No. 29. The Commission also found ample evidence of disparate impact.

However, Broker contends the record lacks convincing evidence demonstrating either (1) that Broker intentionally targeted a protected class or (2) that policies and practices had a disparate impact on the basis of race. Rather, Broker maintains its mission is to provide an opportunity for people with poor credit to obtain funds to get out of debt and keep their homes. Broker claims several of the Complainants first went to other mortgage brokers who turned them down.

 "Although evidence of intent is not necessary to show discriminatory impact, it can support such a finding." *Hargraves,* 140 F.Supp.2d at 21. In reverse redlining cases, evidence of the defendant's advertising efforts in African American communities is sufficient to show intentional targeting on the basis of race. *Id.*

The Commission reviewed Broker's advertisements. On its website, Broker states "[i]t is one of the first African American owned and operated Mortgage and Insurance Financial Services in Philadelphia and the surrounding area." R.R. at 1499a. Broker's website also states "[o]ur primary focus is to assist financially challenged customers in purchasing and or refinancing their existing mortgage, as well as providing various types of insurance." *Id.*

In addition, Anthony McGlawn, Broker's co-founder and insurance specialist, testified Broker engaged in extensive advertising on radio and television, in the newspapers and in the yellow pages. R.R. at 1377–89a. Several of these sources are oriented toward African American audiences and readers. *Id.* Reginald McGlawn also testified the majority of Broker's customers are African Americans. R.R. at 1296a.

Moreover, Complainants testified they contacted Broker as a result of its advertisements. Taylor contacted Broker after viewing one of its television commercials. R.R. at 360a. Poindexter called Broker after listening to one of its radio commer-

cials. R.R. at 744a. Nearly all of the eight similarly situated Complainants also contacted Broker in response to one of its radio, television and newspaper advertisements.

Complainants also testified the decision to contact Broker was influenced by the fact that it was an African American company. For example, both Taylor and Poindexter testified this fact played a role in their decisions to use Broker's services. R.R. at 361a; 744–45a.

The record also indicates Broker's business activities have a disparate impact on African American neighborhoods. This can be established by statistical evidence. *Hargraves*. The Commission accepted the testimony of Radcliffe Davis, a Commission investigator (Investigator). In response to Taylor and Poindexter's complaints, Investigator visited Broker's office and reviewed 100 customer loan applications for things such as refinancing, debt consolidation and home improvement. R.R. at 524a. Of those 100 applications, 66 identified the race of the applicant. *Id.* Of those 66 applicants, 65 were African American. R.R. at 524–25a.

In addition, Complainants' second expert testified he prepared a document mapping the 11 properties involved in this matter. R.R. at 1001a. Nine of these properties were in areas that have at least a 90% African American population. R.R. at 1002–03a. The other two areas have a 50–75% African American population. *Id.*

Considering the foregoing, the Commission's conclusion regarding intentional discrimination is supported by substantial evidence and is in accord with applicable law. *Hargraves*. Complainants also established by statistical evidence that Broker's business activities had a disparate impact on African Americans and African American neighborhoods. *Id.*

In sum, Complainants met their burden of establishing a prima facie reverse redlining claim against Broker. *Id.*

## C. Rebuttal

"Once a prima facie case is established, a rebuttable presumption of discrimination arises." *De Felice*, 782 A.2d at 591. "The burden then shifts to the defendant to show some legitimate, nondiscriminatory reason for its action." *Id.* In predatory lending cases, the financial institution may avoid liability by showing its lending practices were legitimate. *Hargraves*.

Respondents contend Complainants did not prove Broker's business activities were discriminatory because they did not establish Broker made loans to non-African Americans on more preferable terms. This argument was rejected in *Hargraves*. Citing *Contract Buyers League v. F & F Investment*, 300 F.Supp. 210 (N.D.Ill.1969), the *Hargaves* Court recognized that injustice cannot be permitted merely because it is visited exclusively upon African Americans. We adopt this reasoning now.

Respondents also argue that any mortgage broker which arranges sub-prime loans could be considered a predator. We disagree. The interest rates of Complainants' loans are far in excess of the three-point difference usually separating prime and sub-prime loans. In addition, Broker's high broker fees, undisclosed fees and padded closing costs benefited Broker, not Complainants. These types of loans do not serve the borrower's wants or needs. *See In re Barker* (broker's motivation for arranging this type of loan was not to serve borrower's interest, "but to serve its own interest of obtaining a handsome broker's fee.") 251 B.R. at 260. "Such self-dealing constitutes a flagrant violation

of the Broker's fiduciary duties to the [borrower]." *Id.*

Respondents further argue Broker had no legal obligation to ensure Complainants could repay their loans.

■■■■ Whether or not a broker must ensure a client's ability to repay a loan, a broker cannot ignore circumstances suggesting an inability to repay. Indeed, one of the clearest indicators of a predatory and unfair loan is one which exceeds the borrower's needs and repayment capacity. *Hargraves; Troup.*

On several occasions, Broker arranged loans in excess of the amounts Complainants sought. Moreover, Broker discouraged several Complainants from canceling their loans within the three-day rescission period. Broker also submitted falsified documents with Complainants' loan applications indicating Complainants possessed greater income or assets than they really did. Broker's disregard of Complainants' ability to repay their loans strongly supports the Commission's decision to reject the legitimate practice defense.

Respondents also assert they did not target African Americans or African American neighborhoods. Rather, Respondents claim Complainants, who are poor credit risks, came to Broker after being turned down by other brokers.

As discussed above, nearly all Complainants contacted Broker in response to one of its radio, television or newspaper advertisements targeting individuals with poor credit. Further, Broker concentrated its advertising efforts in the African American media. The Commission did not err in concluding Broker intentionally targeted African Americans for sub-prime mortgage loans. *Hargraves.*

Accordingly, no error is evident in the Commission's rejection of the Respondents' legitimate practice defense

## IV. Damage Award

Respondents further contend the Commission's award was excessive and not reasonably related to the alleged harm. The Commission's award of damages, Respondents assert, was arbitrary, burdensome and unreasonable.

Respondents maintain the Commission lacks the authority to award compensatory damages, including damages for embarrassment and humiliation. Citing *W. Middlesex Area Sch. Dist. v. Pennsylvania Human Rels. Comm'n,* 39 Pa.Cmwlth. 58, 394 A.2d 1301 (1978), Respondents argue the Commission is limited by Section 9 of the Act, 43 P.S. § 959, to reimbursing Complainants for costs they incurred due to discriminatory acts.

Respondents' reliance on *W. Middlesex Sch. Dist.* is misplaced. There, the Commission awarded as part of back pay the amount spent on hospitalization insurance costs while the complainant was on forced leave. This Court rejected an argument that the Commission exceeded its authority. We recognized Section 9 of the Act grants the Commission discretion to determine what remedial affirmative action is necessary to effectuate the purposes of the Act. Therefore, this case does not support Respondents' current argument of limited authority to award actual damages.

■■■■ In *Consol. Rail Corp. v. Pennsylvania Human Rels. Comm'n,* 136 Pa. Cmwlth. 147, 582 A.2d 702 (1990), we recognized "the legislature has given the Commission broad remedial powers to cope with the problem of discrimination." *Id.* at 708. "[T]he expertise of the Commission in fashioning remedies is not to be lightly disregarded." *Id.* "[W]e may only upset the Commission's award if we find it is an attempt to achieve ends other than the stated purpose of the Act." *Id.*

■ An award under the Act serves not only to restore the injured party to pre-injury status, but also to discourage future discrimination. *Parks; Williamsburg Cmty. Sch. Dist. v. Pennsylvania Human Rels. Comm'n,* 99 Pa.Cmwlth. 206, 512 A.2d 1339 (1986).

### A. Actual Damages

Section 9(f)(1) of the Act provides in relevant part:

If, upon all the evidence at the hearing, the Commission shall find that a respondent has engaged in or is engaging in any unlawful discriminatory practice as defined in this act, the Commission shall state its findings of fact, and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful discriminatory practice and to take such affirmative action, including, but not limited to, reimbursement of ... services and privileges or lending money, whether or not secured by a mortgage or otherwise for the acquisition, construction, rehabilitation, repair or maintenance of housing accommodations or commercial property, upon such equal terms and conditions to any person discriminated against or all persons, and any other verifiable, reasonable out of pocket expenses caused by such unlawful discriminatory practice, *provided that, in those cases alleging a violation of section 5(d), (e) or (h) or 5.3, where the underlying complaint is a violation of section 5(h) or 5.3, the Commission may award actual damages, including damages caused by humiliation and embarrassment, as in the judgment of the Commission, will effectuate the purposes of this act, and including a requirement for report of the manner of compliance.*

43 P.S. § 959(f)(1) (emphasis added). As this Section provides, the Commission may award compensatory damages where the complainant establishes a violation of Section 5(h) of the Act, 43 P.S. § 955(h), generally relating to housing discrimination.[22] Here, the Commission awarded Complainants actual damages, including damages for embarrassment and humiliation. We first review the Commission's award of special damages, which consisted of two separate components.

### 1.

■ The first component of special damages consisted of monies paid to Bro-

---

22. Respondents further contend their due process rights were violated because Complainants were awarded damages for past losses despite their failure to specifically plead items of special damages. Pursuant to Pa. R.C.P. No. 1019(f), a complaint must specifically aver items of special damages. However, Section 9(e) of the Act provides "[t]he Commission shall not be bound by the strict rules of evidence prevailing in courts of law or equity." 43 P.S. § 959(e). In addition, "[t]he Pennsylvania Rules of Civil Procedure ... [including Rule 1019(f)], do not apply to proceedings before administrative agencies and commissions." *Freeport Area Sch. Dist. v. Com., Human Rels. Comm'n,* 18 Pa. Cmwlth. 400, 335 A.2d 873, 879 (1975), *aff'd as modified,* 467 Pa. 522, 359 A.2d 724 (1976).

Neither the Commission's rules, found at 16 Pa.Code § 42, nor the General Rules of Administrative Practice and Procedure, found at 1 Pa.Code §§ 31–35, require Complainants to specifically plead items of special damages to be entitled to an award of actual damages. A complaint filed under the Act may be amended at any time, by leave of the Commission, to cure technical defects and omissions. 16 Pa. Code § 42.35.

Moreover, Respondents do not explain how they were prejudiced by the absence of special damage calculations in the complaints. Absence of prejudice is especially relevant here, where most of the information for the damage calculations was present in Respondents' records.

ker out of the mortgage loan proceeds for items which benefited Broker, but not the borrowers. These items included Broker's disclosed and undisclosed broker fees, insurance premiums, and yield spread premiums. Complainants submitted documentation setting forth these calculations. *See* Comm'n Dec., Appendix A; R.R. at 173–74a. Respondents did not introduce any evidence contradicting these calculations.

Section 9(f)(1) of the Act authorizes the Commission to restore Complainants to their pre-injury status. *Consol Rail Corp.* Thus, the Commission had the authority to award Complainants reimbursement for these actual expenses.

### 2.

■ The second component of the special damage award consisted of the difference between the total amount of interest Complainants will pay as a result of their predatory loans and the total amount of interest they would have paid with a loan at the prevailing mortgage interest rate. The Commission took administrative notice of a 5% prevailing mortgage interest rate for purposes of calculating Complainants' damages. It explained that the difference in the amount of Complainants' interest payments is the essence of the predatory impact of these loans. It also noted Complainants will have these obligations for the life of the loans, which for most Complainants is 30 years.

Respondents contend there are several problems with the Commission's damage calculation. We agree.

First, the time frame for the interest rate calculation is unclear. The loans in question were made between 1998 and 2000. Complainants' second expert testi-fied a Department of Housing and Urban Development publication lists the national average interest rates by year. R.R. at 958a.[23] However, the Commission did not establish the applicable interest rate at the time Complainants signed their loan documents. In fact, the Commission does not indicate the time period the 5% prevailing interest rate was in effect.

Second, the Commission did not take into account Complainants' credit ratings. The Commission did not determine whether Complainants had prime credit or subprime credit. Complainants' second expert testified a non-predatory sub-prime loan to an individual with an enhanced credit risk will be about two to three percentage points higher than a loan to an individual qualifying for prime credit. R.R. at 940a. The Commission did not take this fact into account in calculating the difference between Complainants' predatory interest rates and the 5% prevailing interest rate. In short, substantial evidence does not support a finding that a 5% interest rate was realistically available to Complainants.

For these reasons, we vacate this component of the Commission's damage award. However, we agree that Complainants are entitled to recover this damage component. Therefore, we remand for a recalculation of these damages based upon (1) an individual assessment of whether Complainants were entitled to prime credit or sub-prime credit, and (2) an accurate assessment of damages based on the difference between Complainants' loans' actual interest rates and the interest rates realistically available to them at the times of the loans. If necessary, the Com-

---

23. For example, he testified the average rate for a 30–year fixed Federal Housing Administration loan in 1999 was 7.5% with half a point. The average conventional rate in 1999 was 7.44% with one point.

mission may take such additional evidence as needed to support its recalculation.

## B. Humiliation and Embarrassment

■ Respondents also contend the award for embarrassment and humiliation exceeded the Commission's authority under the Act. We disagree.

■ In *Allison v. Pennsylvania Human Rels. Comm'n*, 716 A.2d 689 (Pa. Cmwlth.1998), this Court approved an award of $8,000.00 in compensatory damages for humiliation suffered as a result of housing discrimination in violation of Section 5(h)(1) of the Act, 43 P.S. § 955(h)(1). In determining whether the evidence of emotional distress is sufficient to support an award, we look at both the direct evidence of emotional distress and the circumstances of the act that allegedly caused the distress. *United States v. Balistrieri*, 981 F.2d 916 (7th Cir.1992).

Here, Complainants' testified regarding the emotional distress suffered as a result of their dealings with Broker. Taylor testified she no longer trusts anyone and does not socialize anymore. She further stated she frequently cries and suffers from anxiety-related sleep and appetite disturbances. All of these difficulties resulted from her dealing with Broker. Comm'n

Dec. at 47–48. The Commission awarded her $25,000.00. *Id.*

Poindexter also testified she suffers from depression as a result of her dealings with Broker. Her self-esteem was shattered and she relives the experience with every payment. Poindexter further stated she suffers from headaches and sleeplessness. She feels like she was stabbed in the back by people she trusted. Comm'n Dec. at 48. The Commission awarded Poindexter $15,000.00. *Id.*

The Commission reviewed each of the similarly situated Complainants' testimony regarding the emotional and physical distress they suffered as a result of their experiences with Broker and awarded each of them damages for humiliation and embarrassment. *See* Comm'n Dec. at 48–52.

Given the direct evidence of emotional distress as well as the circumstances of fraud, deceit, and betrayal of trust, we conclude the awards for embarrassment and humiliation were within the Commission's statutory authority.

■ Respondents also contend the Commission's award violated their constitutional due process rights by awarding damages not only to Complainants Taylor and Poindexter, but to each of the similarly situated persons.[24] We disagree.

24. Reginald McGlawn, individually, asserts the Commission violated his constitutional due process rights by adding him as a named respondent at the close of the Panel hearing. This issue, although raised in Reginald McGlawn's petition for review, was not addressed in Respondents' brief. Generally, issues not briefed are waived. *See Tyler v. Unemployment Comp. Bd. of Review*, 139 Pa. Cmwlth. 598, 591 A.2d 1164 (1991).

Moreover, this contention lacks merit. At the hearing, Reginald McGlawn testified that Broker's 2000 Annual Report, filed with the Department of Banking, failed to disclose the loans arranged for Complainants Taylor, Hawkins, Watts, Slaughter and Miles. He also stated he collected broker fees in these transactions which were not reported in Broker's 2000 Annual Report. Reginald McGlawn further testified Broker's 2000–02 Annual Reports failed to disclose Broker was a defendant in at least five federal actions. Four of these cases involved allegations Broker violated the Truth–In–Lending Act, 15 U.S.C. §§ 1610–1693r. In the other action, *In re Barker*, the United States Bankruptcy Court held Broker's conduct in a mortgage loan transaction constituted common-law fraud and violated several Pennsylvania consumer protection statutes.

In view of Reginald McGlawn's admissions, Complainants asserted that Broker's corporate entity should be disregarded. Thus, Complainants sought to amend their com-

Relief under Section 9 of the Act, 43 P.S. § 959, when granted, is class relief. *Pennsylvania Human Rels. Comm'n v. Freeport Area Sch. Dist.,* 467 Pa. 522, 359 A.2d 724 (1976). There, the Court held the Commission "may order affirmative relief for persons other than the named [complainant] when (1) the complainant alleges that such other persons have been affected by the alleged discriminatory practice and (2) such other persons entitled to relief may be described with specificity." Id. at 530, 359 A.2d at 728. The specificity requirement may be met by supplying the Commission with the names of other persons affected by the alleged discriminatory action. *Id.*

"Whenever a person seeks relief for unnamed persons, other than a cease and desist order, the complaint shall include an allegation to the effect that the complaint is made on behalf of other persons who have been affected by the alleged unlawful discriminatory practice." 16 Pa.Code § 42.36(a). Here, Paragraph No. 31 of Taylor's amended complaint stated her allegations of discrimination against Broker are made on behalf of herself and "all other persons who have been affected by the aforementioned discriminatory practices." R.R. at 674a. Paragraph 24 of Poindexter's complaint contains similar language. R.R. at 734a.

Further, Investigator testified Broker denied his request for documents relating to other persons affected by Broker's discriminatory practices. R.R. at 520–21a. This Court entered an order directing Broker to produce such documents. R.R. at 730a. When Broker produced these documents, the Commission was able to identify with specificity the eight similarly situated persons in this matter.

Respondents were aware Complainants sought relief for similarly persons. Respondents were also aware of the names of these persons. Respondents' due process rights were not violated by the Commission's award of damages to the eight similarly situated persons. *Freeport Area Sch. Dist.*

plaints to add Reginald McGlawn as a named Respondent. The motion was granted.

Section 9(e) of the Act, 43 P.S. § 959(e), provides:

The Commission or the complainant shall have the power reasonably and fairly to amend any complaint, and the respondent shall have like power to amend his answer.

16 Pa.Code § 42.35 provides:

(a) The complaint or answer maybe amended at any time prior to approval of a hearing on the merits *and thereafter by leave of the Commissioners, hearing commissioners or permanent hearing examiner.*

(b) The complaint may be amended to cure technical defects or omissions, to clarify or amplify allegations made therein, *or to add material allegations which are related to or grow out of the subject matter of the original complaint,* and these amendments shall relate back to the original filing date of the complaint. (Emphasis added.)

16 Pa.Code § 42.35(a) gives the Commission discretion to permit amendments to a complaint at any time during the proceedings. Due process requirements are met when (1) respondent is informed with reasonable certainty of the nature of the charges against him, (2) respondent has timely notice and an opportunity to answer these charges and defend against attempted proof of them and (3) the proceedings are conducted in a fair and impartial manner. *Speare v. Pennsylvania Human Rels. Comm'n,* 16 Pa.Cmwlth. 502, 328 A.2d 570 (1974).

In some cases, we might question a decision to permit an amendment during hearings adding a principal as a named respondent. Here, however, we discern no error for several reasons. First, Reginald McGlawn was actively involved throughout the litigation. Also, he was personally involved in many of the transactions. Thus, there is no reason to conclude he was unprepared to defend or that the timing of the amendment caused prejudice. Second, his admissions were the basis for the motion to amend.

## C. Civil Penalty

■ Respondents next contend the Commission erred by awarding a civil penalty in favor of each Complainant.

The Commission did not award a separate civil penalty for each Complainant. Paragraph 3 of the Commission's final order directs that Respondents, "jointly and severally, shall pay a civil penalty to the *Commonwealth of Pennsylvania* in the amount of $25,000." R.R. at 170a (emphasis added).

Section 9(f)(2) of the Act, 43 P.S. § 959(f)(2), authorizes the Commission to assess a civil penalty against recidivist respondents in a case of housing discrimination filed under Section 5(h). Subsection (f)(2)(ii) permits a penalty in the maximum amount of $25,000.00 "if the respondent has been adjudged to have committed one other discriminatory practice during the five-year period ending on the date of [the Commission's order]." 43 P.S. § 959(f)(2)(ii).

In assessing the $25,000.00 penalty, the Commission noted it considered five factors: (1) the nature of the violation, (2) the degree of culpability, (3) Respondents' financial resources, (4) the goal of deterrence and (5) other matters as justice may require. Comm'n Dec. at 52.

The Commission found Respondents' discriminatory practices were "particularly heinous" because they involved fraud, deceit and the betrayal of trust. *Id.* The Commission further found Respondents had substantial financial resources. The Commission noted its strong interest in deterring Respondents' discriminatory practices. *Id.* at 53, 529 A.2d 571. It further determined Respondents committed at least two discriminatory actions during the past five years, one each against Taylor and Poindexter. *Id.* The Commis-

sion's civil penalty award is therefore in accord with applicable law.

## V. Conclusion

For the foregoing reasons, the component of the Commission's award of actual damages based on the difference between Complainants' predatory interest rate and a 5% prevailing mortgage interest rate is vacated, and this case is remanded for further proceedings consistent with this opinion. In all other respects, the Commission's order is affirmed.

## *ORDER*

AND NOW, this 13th day of January, 2006, the order of the Pennsylvania Human Relations Commission in the above-captioned matters is **AFFIRMED** in part and **VACATED and REMANDED** in part.

The order is **VACATED** to the extent it awarded damages based on the difference between Complainants' predatory interest rates and a 5% prevailing interest rate. This matter is **REMANDED** for a recalculation of that damage component consistent with the foregoing opinion. If necessary, the Commission may take additional evidence and make additional findings and conclusions in support of its recalculation.

In all other respects, the Commission's order is **AFFIRMED.**

Jurisdiction is relinquished.