*275 OPINION OF THE COURT
Herbert Kramer, J.
Equity abhors discrimination.
Equity will not enforce discriminatory practices.
This court holds, for reasons set forth below, that a mortgage granted to a minority buyer for the purchase of property in a minority area which carries an interest rate that exceeds nine percent creates a rebuttable presumption of discriminatory practice.
This court further holds that the lender who has brought this proceeding to foreclose the mortgage must demonstrate by a fair preponderance of the evidence that the mortgage was not the product of unlawful discrimination.[1] If the lender is unable to do so, the foreclosure proceeding will be dismissed and the lender left to its remedies at law.
Major Jahn K. Foy, a reserve officer, was engaged on active duty when foreclosure proceedings were initiated against her property, 517 Rogers Avenue in Brooklyn, which is located within a minority neighborhood.[2] The 30-year note and mortgage dated July of 2000 carried an interest rate of 972%.
Previously, Major Foy moved to reform the mortgage pursuant to New York Military Law claiming, in essence, that her ability to comply with the terms of the 9½% mortgage was materially affected by her deployment on several tours of active duty over the course of the past several years. This court granted a hearing. (See M&T Mtge. Corp. v Foy, 15 Misc 3d 1148[A], 2007 NY Slip Op 51199[U] [June 14, 2007].)[3]
*276 Review of the posthearing submissions and additional research suggested that the defendant may have been the victim of a process called “reverse redlining.”[4] Accordingly, on December 6, 2007, this court informed the parties that it intended to continue the hearing and placed the burden on the defendant to demonstrate that she was a victim of discriminatory lending.[5]
Thus, the court now modifies that decision so as to place the burden of proof upon the plaintiff to demonstrate that the loan in question is not a “higher priced loan” which is the product of discriminatory practices.[6] In so doing this court is mindful of the effect of discrimination upon the larger population. Research has revealed that when minorities subjected to discrimination represent a very small percentage of the population, the cost of discrimination falls mainly upon the minority; however, when they represent a larger segment of society, the cost of discrimination falls upon both the minorities and the majority as currently evidenced by the worldwide subprime mortgage meltdown.[7]
In shifting the burden of proof this court will use the Home Mortgage Disclosure Act (HMDA) definition of “higher priced loan”[8] to determine whether the loan is one that may require *277 further investigation for possible discriminatory practices. A loan is deemed
“ ‘higher priced’[9]. . . [if its] rate spread . . . [for a first tier loan] is three percentage points above the Treasury security of comparable maturity .... [Moreover,] [t]hough the price data [in and of itself does not] support definitive conclusions [with respect to the issue of unlawful discrimination, it provides] a useful screen, previously unavailable, to identify lenders, products, applicants, and geographic markets where price differences among racial or other groups are sufficiently large to warrant further investigation.” {Frequently Asked Questions About the New HMDA Data, Price Data on “Higher-Priced Loans” [Federal Reserve Bank Apr. 2006]; see also Proposed Rules, Regulation Z, 73 Fed Reg 1673.)
“In fall 2005, the Board of Governors of the Federal Reserve System published its first study of the new HMDA interest-rate data.” (Julia Read, HMDA, New Pricing Data [Federal Reserve Bank of Boston spring 2006].) HMDA data is used by government agencies to identify, inter alia, loans, institutions or geographic markets that
*278 Extensive national analyses of mortgage pricing patterns across racial and ethnic groups revealed that “[traditionally under-served minority groups were more likely than other populations to pay higher prices for mortgages. ” (HMDA, New Pricing Data [emphasis added].)
*277 “show disparities in loan applications or originations by race, ethnicity, or other characteristics that may warrant further investigation under ECOA or FHA. With the addition of price data for higher-priced loans, the agencies are also able to identify in the HMDA data price disparities that may warrant further investigation.”[10] (Frequently Asked Questions, General Background.)
*278 The mortgage in the instant matter and indeed most 30-year mortgages written after the year 2000, which call for an interest rate of nine percent, would constitute “higher priced loans” under these criteria.[11] Thus, this court holds that an interest rate exceeding nine percent evidences the existence of a higher priced loan and creates a rebuttable presumption of discrimination. (See also McGlawn v Pennsylvania Human Relations Commn., 891 A2d 757 [Pa Commw Ct 2006] [Pennsylvania Human Relations Commission relied upon expert testimony indicating that an interest rate three percent beyond that which exists in the general market is predatory and thus discriminatory].)
Equity, which abhors unconscionable and unjust results, mandates a shift in the burden of proof to the plaintiff lender to demonstrate that the loan is not discriminatory.[12] Indeed, our decisional law has long since recognized that a litigant “seeking affirmative judicial action in equity . . . may not succeed if [the litigant] is asking [for] an inequitable or unconscionable result.” *279 (Monaghan v May, 242 App Div 64, 66 [2d Dept 1934],)[13] Moreover,
“[i]n the absence of legislation, courts of equity have exercised jurisdiction in suits for the foreclosure of mortgages to fix the time and terms of sale and to refuse to confirm sales upon equitable grounds where they were found to be unfair or inadequacy of price was so gross as to shock the conscience.” (Home Building & Loan Assn. v Blaisdell, 290 US 398, 446 [1934].)
“As we have seen, equity will intervene in individual cases where it is palpably apparent that gross unfairness is imminent. That is the law of New York.” (Gelfert v National City Bank of N. Y., 313 US 221, 233 [1941].) Indeed, in our current climate where — this court takes judicial notice — there are substantial amounts of undefended foreclosure proceedings in minority neighborhoods, the placement of the burden of proof upon the borrower[14] who is very much in a distaff position when it comes to protecting his or her rights, renders illusory the possibility of meaningful legal redress. (See e.g. EquiCredit Corp. of N.Y. v *280 Turcios, 300 AD2d 344 [2d Dept 2002] [counterclaims alleging reverse redlining practices in claimed violation of the Equal Credit Opportunity Act and the Fair Housing Act dismissed for failure to show that mortgagors qualified for the loans in question as required pursuant to these statutes].)
The courts are not merely automatons mindlessly processing paper motions in mortgage foreclosure actions most of which proceed on default. Where, as here, there is a presumably discriminatory rate, the court must order a hearing in a litigated action or an inquest where there is a default. This presumption may be rebutted by proof that the mortgage was given for nondiscriminatory economic reasons.[15]

. Since it is the plaintiff lender who seeks equitable relief from this court, the onus is upon the lender to satisfy the requisites of equity and come to this court with “clean hands.” (Junkersfeld v Bank of Manhattan Co., 250 App Div 646 [1st Dept 1937].) This is a threshold consideration and thus the existence or lack thereof of any actual or potential defenses to the action is of no mo: ment.

. See map of Brooklyn, New York identifying minority areas which are those whose populations are greater than 50% black or Hispanic. The map shows subprime refinancing loans (2003) and foreclosure patterns June 2004 to May 2005 and was prepared by the Neighborhood Economic Development Advocacy Project (www.nedap.org).

. Major Foy’s testimony revealed that her military income was in parity with her civilian income. However, she asserted that her military service placed her at a disadvantage because her frequent and lengthy absences from the country, which were detailed in the above-cited decision, made it extraordinarily difficult for her to effectively repair and maintain her property so that she could attract and keep viable tenants and collect rents. This circumstance interfered with her ability to make payments on the mortgage in question.

. “Redlining is the practice of denying the extension of credit to specific geographic areas due to the income, race, or ethnicity of its residents. The term was derived from the actual practice of drawing a red line around certain areas in which credit would be denied. Reverse redlining is the practice of extending credit on unfair terms to those same communities.” (United Cos. Lending Corp. v Sargeant, 20 F Supp 2d 192, 203 n 5 [D Mass 1998].)

. At the present juncture, Major Foy is again on a tour of active duty and the attorney who had represented her during these proceedings has asked to be relieved. Thus, the proceedings are stayed.

. The court’s ability to supervise lending practices that take advantage of unsophisticated borrowers is not newly minted. There is a well established statutory and common-law basis for the supervision of purchasers of streams of income to insure that the purchase of income from lotteries or settlements is not accomplished at a high rate of interest. (See e.g. Matter of Cabrera, 196 Misc 2d 329 [Sup Ct, Kings County 2003]; Matter of Settlement Capital Corp. [Ballos], 1 Misc 3d 446 [Sup Ct, Queens County 2003].) This court has found that an interest rate of nine percent which is the judgment interest rate is reasonable and has approved those applications where all other circumstances being equal a rate no greater than that is charged.

. (Gary S. Becker, The Economics of Discrimination [Univ. of Chicago Press 1957, 1971 2d ed]). Gary Becker is a 1992 Nobel laureate in economics.

. Home Mortgage Disclosure Act of 1975 (12 USC § 2801 et seq.).

. This is to be distinguished from the Home Ownership and Equity Protection Act which targets high cost loans and imposes substantive restrictions and special preclosing disclosures on particularly high-cost refinancing and home equity loans where the “APR at consummation will exceed the yield on Treasury securities of comparable maturity by more than 8 percentage points for first-lien loans” (Board of Governors of Federal Reserve System, Proposed Rules, Regulation Z, 73 Fed Reg 1677 n 23 [2008]). Regulation Z implements the federal Truth in Lending Act and the Home Ownership and Equity Protection Act in order to protect consumers in the mortgage market from unfair, abusive or deceptive lending and services practices. (See also Banking Law § 6-1 [which has comparable standards and restrictions].)

. If disparities are found to violate the Equal Credit Opportunity Act or Fair Housing Act, certain federal agencies are authorized to compel lenders to cease discriminatory practices and, among other remedies, obtain monetary relief for victims. (HMDA, New Pricing Data.) “The price data take the form *278 of a ‘rate spread’. Lenders must report the spread (difference) between the annual percentage rate (APR) on a loan and the rate on Treasury securities of comparable maturity — but only for loans with spreads above designated thresholds.” (Frequently Asked Questions, Price Data on “Higher-Priced Loans.”)

. The loan in question is a year 2000, 30-year loan with an interest rate of 9V2%. The monthly history of the constant maturity Treasury yields reveals that since the year 2000 to date there have been only two months where the 30-year treasuries exceeded six percent.

. With respect to the burden of proof, there is proposed legislation by the governor addressing the subprime mortgage crisis which includes a provision that would require the plaintiff in a foreclosure action to allege and prove that its mortgage and note has complied with provisions of New York law. This of course would include Banking Law § 6-1 which speaks to high cost lending and which would be expanded and strengthened under this new legislation to include a prohibition against the financing of points and fees in excess of three percent of the principal amount of the loan.
To the extent that the plaintiff, who took assignment of this mortgage from Community Bank, may make a claim of “holder in due course,” it is the plaintiff that has the burden of proof in this regard. (See In re AppOnline.Com, Inc., 290 BR 1 [ED NY 2003].) However, a holder in due course is presumptively aware of the rate of interest charged on the note.

. There is a misunderstanding about the significance of the Monaghan decision that needs clarification. Monaghan involved property that was purchased at a foreclosure sale price so inadequate as to shock the conscience and, even prior to the effective date of applicable legislation, liability for the deficiency was cancelled. The Court of Appeals was uncomfortable with what it believed to be an ad hoc application of the “shock the conscience-inadequacy” principle and thus rejected the Monaghan Court’s statement that
“ ‘[n]o rights vest ... in plaintiff for a deficiency judgment in any amount until plaintiff satisfies a court of equity that it would be equitable and just, as a consequence of what has occurred on the sale, to authorize the entry of a deficiency judgment[,]’ [saying that] . . . [t]his statement did not accurately represent the New York law.” (National City Bank v Gelfert, 284 NY 13, 19-20 [1940].)
This case was reversed (313 US 221, 233 [1941]), with the Justices of the Supreme Court explicitly contradicting this statement saying “equity will intervene in individual cases where it is palpably apparent that gross unfairness is imminent. That is the law of New York” (emphasis added, citing Fisher v Hersey, 78 NY 387 [1879]). Thus the apparent challenge to the Monaghan decision cannot be sustained upon closer scrutiny. (Cf. Leibowits v Leibowits, 93 AD2d 535, 546 [2d Dept 1983, O’Connor, J., concurring].)

. In a seminal decision under the Fair Housing Act the court adopted a two-prong test for discrimination: first the plaintiff must establish the defendant’s lending practices and loan terms were predatory and unfair; and second the plaintiff must establish that defendant intentionally targeted them because of their race or that the defendant’s lending practices had a disparate impact on the basis of race. (Hargraves v Capital City Mortg. Corp., 140 F Supp 2d 7, 20 [D DC 2000].)

. Upon notice to the court, the hearing in the instant matter will be continued but is now stayed due to the defendant’s active military service overseas.